19 A.3d 859

PRINCE GEORGE'S COUNTY, Maryland, et al.

v.

Keith LONGTIN.

No. 35, Sept. Term, 2010.

Court of Appeals of Maryland.

April 25, 2011.

Reconsideration Denied June 16, 2011.

452

Rajesh A. Kumar, Acting Deputy County Atty. (Stephanie P. Anderson, County Atty., and Peggie N. McWhorter, Associate County Atty., Upper Marlboro, MD), on brief, for petitioners.

Car J. Hansel (Timothy F. Maloney, Steven B. Vinick, and Joseph M. Creed of Joseph, Greenwald & Laake, P.A., Greenbelt, MD), on brief, for respondent.

David M. Funk, Esq., Karen J. Kruger, Esq., Funk & Bolton, P.A., Baltimore, MD, for Amicus Curiae brief of Local Government Insurance Trust.

Deborah A. Jeon, Esq., Ajmel Quereshi, Esq., American Civil Liberties Union of Maryland, Baltimore, MD, for Amici Curiae brief of the American Civil Liberties Union of Maryland and the Public Justice Center.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

ADKINS, J.

In this case, we must decide the extent to which the Local Government Tort Claims Act (the "LGTCA")[1] limits the recovery of a man whose constitutional rights have been violated by a local government and its police force. Respondent Keith Longtin was arrested, interrogated for over 36 hours, and charged with the rape and murder of his wife. He was held in prison for over eight months. During his stay in prison, the Prince George's County Police Department (the "Department") obtained exculpatory DNA evidence and evidence of a serial rapist in the area where Longtin's wife was killed, but failed to inform Longtin or release him. Only when the Department confirmed, through a DNA match, that the crime was committed by the other suspect, did it release Longtin from prison.

Longtin sued the Department, Prince George's County, and individual officers,[2] (together, the "Defendants") and obtained a jury verdict totaling $6.2 million. The Defendants noted an appeal, and the Court of Special Appeals affirmed the verdict. The Defendants then petitioned this Court, and we granted a writ of certiorari to review the following questions, rephrased for the sake of clarity and brevity:

1. Whether the Respondent's claim is precluded for a failure to comply with the notice requirements of the LGTCA?

2. Whether the LGTCA damage cap applies to a monetary award against a local government and/or its employees for violations of the Maryland Constitution and limits the recovery awarded by the trial court?

---

**1.** The Local Government Tort Claims Act ("LGTCA" or "the Act") is located at Md.Code (1974, 2006 Repl.Vol.), § § 5–301 *et seq.* of the Courts & Judicial Proceedings Article ("CJP").

**2.** The named individual defendants are Ronald Herndon, Troy Harding, Bert Frankenfield, and Glen Clark. The Chief of Police and another detective were dismissed as defendants before trial.

3. Whether Maryland recognizes a *"Monell*-type"[3] claim based on a "pattern or practice" violation of the Maryland Constitution?

4. Whether the trial court abused its discretion in allowing introduction of evidence of exculpatory DNA results and the subsequent conviction and crimes of another person for that murder?

We shall affirm.

## FACTS AND LEGAL PROCEEDINGS

### 1. The Murder of Donna Zinetti

Longtin and Donna Zinetti met in Prince George's County, Maryland, in 1998. They married a few months later, moving into an apartment in Laurel, MD. The relationship was troubled from the start, and the couple eventually separated, Longtin moving out of their home and into a friend's apartment. By October 4, 1999, Longtin and Zinetti had been separated for approximately 2 weeks.

In the afternoon of October 4, 1999, Donna Zinetti's body was discovered in the woods behind her apartment. She had been raped and stabbed to death while jogging sometime on October 4th. Upon discovery of the body, police began a criminal homicide investigation.

Police investigating the crime quickly learned of an altercation between Longtin and Zinetti the day preceding her murder, October 3, 1999, a Sunday. That morning, Longtin and Zinetti attended Zinetti's church. After the service, Longtin overheard a comment from a member of the church to Zinetti, and became enraged, suspecting an extramarital affair. After arguing with Zinetti and church members, Longtin was approached by another man, who attempted to calm him.

---

**3.** "Monell" refers to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), in which the United States Supreme Court recognized that a municipality could be liable, under 42 U.S.C.A. § 1983, for "causing" unconstitutional actions by its employees through poor training or suspect policies. *Monell* claims are discussed in detail, *infra*.

Longtin pushed the man, ran to his truck, and rapidly exited the church parking lot. After learning of this incident, the Criminal Investigation Division ("CID") considered Longtin a suspect.

The next day, not having heard from Zinetti, Longtin called the Prince George's County police to report her as a missing person. Though Longtin was already a suspect, the police "went along" with him and arranged a meeting purportedly to get him to sign a missing persons form. The officer who took the call then wrote a note to the lead detective informing him of the arranged meeting, and closing with "Good luck: Get him!" Soon after that, Longtin saw on a television news report that a female's body had been discovered near Zinetti's apartment complex. Longtin traveled to the scene.

When he arrived at the crime scene, he approached a police officer, identified himself, and asked for more information. The officer, recognizing Longtin as a suspect, called the CID and asked for guidance. He then approached Longtin, asked him to get into his police cruiser, and took him to the interrogation room in the Landover police station.

Longtin was questioned over the next twenty-seven hours [4] by multiple police officers, and Longtin repeatedly and "emphatically" denied killing his wife. Longtin testified that he requested a lawyer during the interview, and his cell phone records show attempted calls to two different lawyers from the interrogation room. Although they had taken his belt, wallet, shoelaces, and at some point, his cell phone, the officers maintained that Longtin was not under arrest during this interrogation, thus justifying their decision not to advise him of his *Miranda* rights or present him to a commissioner within the 24–hour period required by Md. Rule 4–212. As Longtin later described, he was unable to sleep during the interrogation.

---

**4.** Testimony as to the alleged length of the interrogation varied at trial. In opening arguments, Longtin's counsel stated that the detention lasted 39 hours and 20 minutes. Later, the length of the interrogation was identified as 30 hours, and 28 ½ hours.

During this "marathon" investigation, Longtin revealed some suspicious details. Longtin mentioned Zinetti's "walkman," which was found by her body at the crime scene, a detail the police believed only the killer would know. Longtin also told an officer that the police would "never find" the knife used in the murder. Moreover, Longtin's boss reported to police that Longtin had called her on the morning of Zinetti's murder (after their dispute at church), and said he was in Canada to visit his sick father and would not be in to work that day.

After approximately twenty hours in interrogation, one detective asked Longtin a series of "what if" questions, asking him to imagine how the murder took place. Longtin responded that he had a vision in which someone grabbed Zinetti from behind in the kitchen hallway, holding a kitchen knife to her throat. At that point, another officer took over the interrogation, and resumed the questioning. Longtin, who had not slept for about 24 hours, provided more details to this officer regarding his vision, stating that he would have gone to Zinetti's home around 11:30 p.m., where he would have pushed Zinetti to the floor. He stated that Zinetti would have left her house to go for a run, after which he would have gone into the kitchen, grabbed a knife, and begun to chase her.

On October 7, 1999, Keith Longtin was arrested and charged with first-degree murder in the death of his wife. Longtin was presented to a commissioner that day, and police prepared a Statement of Probable Cause, which read as followed:

On 10–4–99 at about 1343 hrs the victim, Donna Zinetti was found dead in the wooded area along the 13100 block of Larchdale Rd Laurel, Prince George's County, Maryland. The victim was subsequently transported to the medical examiner's office in Baltimore, Maryland [where] a post-mortem exam was performed and the ruling of her death was a homicide.

During this investigation the Def[endant] who is the victims estranged husband volunteered to come in and talk

with investigators about this incident. While interviewing the Def[endant,] he was developed as a suspect. At that point the Def[endant] was advised [of] his constitutional rights and subsequently admitted to be[ing] involved in this case.

The defendant admitted to having a verbal and physical altercation at the victim's apartment. The defendant gave details about this case that had not been released to the media and only the perpetrator would have known. He stated that during the altercation the victim ran out of her apartment and that he ran after her with a knife. The defendant knew that the victim had been stabbed several times and that the stabbing occurred in the wooded area near the victim's apartment.

Longtin was then held in jail, awaiting trial.

Significantly, the Statement listed Longtin's responses to the "what if" questions as though they were factual admissions. The Statement declared that Longtin "admitted to having a verbal and physical altercation at the victim's apartment[,]" even though Longtin had maintained that he was at home on the night of the murder, and only described the "altercation" at her apartment in response to a "what if" question after nearly twenty hours of interrogation. The Statement also included Longtin's statement that "the victim ran out of her apartment and that he ran after her with a knife[,]" an "admission" which directly followed his other hypothetical, "what if" statements.[5]

---

5. Although, at trial, the interviewing officer first said that this was Longtin's account of actual events, the officer later admitted that these details could have been details of a vision. The first mention of the 11:30 p.m. visit came in response to a "what if" question, and the details about the chase came shortly thereafter. Prior to this instance, Longtin had been insistent that he was at his home the night of Zinetti's murder. Given the jury's obvious acceptance of Longtin's version of the story, we have phrased this disputed fact in the light most favorable to Longtin. *See Owens–Illinois, Inc. v. Cook,* 386 Md. 468, 872 A.2d 969 (2005) (stating facts "in the light most favorable to the ... prevailing parties on liability at trial[.]").

During the investigation, the police collected two possible DNA samples which could have implicated Longtin. Besides comparing Longtin's DNA with the DNA of the perpetrator, they also detected a blood sample on Longtin's couch, and compared that to Zinetti's DNA. On January 20, 2000, the Crime Laboratory Division of the Maryland State Police ("Crime Lab") completed its examination of the couch sample, and sent a letter to Detective Herndon that the test showed the blood was neither Longtin's nor Zinetti's. Then, on February 23, 2000, the Crime Lab completed its investigation of the DNA found on the vaginal swabs, and concluded that Longtin was "excluded as [a] possible donor[ ] of the DNA extracted[.]" [6] Detective Herndon was also notified of this finding. Longtin was unaware of these DNA test results, and remained in prison through the Spring of 2000.

While Longtin's charges were pending, an unknown perpetrator committed a series of similar crimes in the immediate vicinity of the Zinetti murder. Police eventually arrested a suspect for these crimes, Antonio Oesby, although they did not immediately link Oesby to the Zinetti murder. Later, the police submitted Oesby's DNA for comparison against the perpetrator of Zinetti's murder.

By June 12, 2000, the Crime Lab completed its analysis of the DNA connected from the vaginal swabs, and confirmed a match with Oesby's DNA sample. The Lab again notified Detective Herndon, who relayed the information to the State's Attorney's office. Longtin was released on June 13, 2000. At that point, he had spent over eight months in prison, the last six months of which occurred after the exculpatory DNA test results. Moreover, as the Court of Special Appeals described, Longtin's imprisonment wreaked havoc on his life:

During his incarceration, Longtin lost three automobiles. He was evicted from his apartment and his possessions were left on the curb. In the detention center, he was attacked by an inmate, and placed in a mass bunk in the

---

6. The lab report also excluded two other suspects.

middle of the floor with female guards watching him use the restroom. He was not permitted to attend his wife's funeral. As the trial judge noted when ruling on appellants' post-trial motions, Longtin left County custody "with little more than the clothes on his back."

*Prince George's County v. Longtin,* 190 Md.App. 97, 114, 988 A.2d 20, 29 (2010) (*"Longtin "*).

## 2. Longtin's Civil Suit

On October 22, 2001, Longtin filed a civil law suit in the Circuit Court for Prince George's County, naming the County, it's then-Chief of Police, and five members of the Criminal Investigation Division, including the interrogating officers. Longtin's thirteen-count complaint alleged, among other things, constitutional violations, a "pattern or practice" claim,[7] and various common law claims such as false arrest and malicious prosecution.[8] The trial began almost five years later, on August 14, 2006. At the start of the trial, the court granted partial motions for summary judgment with regards to two of the original thirteen counts.[9]

At trial, Longtin sought to establish unconstitutional actions by the police officers during his initial arrest and interrogation. Longtin described how the officers showed him grue-

---

**7.** We shall define the term and explain, in more detail, the history of "pattern or practice" claims below.

**8.** Specifically, Longtin's complaint contained the following counts: (1) violations of the Maryland Declaration of Rights, Article 21, (2) violations of the Maryland Declaration of Rights, Article 24, (3) false arrest, (4) false imprisonment, (5) malicious prosecution, (6) intentional infliction of emotional distress, (7) invasion of privacy/false light, (8) pattern or practice of improper conduct, (9) intentional misrepresentation, (10) negligent detention, (11) civil conspiracy, (12) a request for declaratory judgment, and (13) negligence.

**9.** The trial court granted Defendant's Motion for Partial Summary Judgment on Longtin's Count 9, regarding intentional misrepresentation of facts. The court stated that "the Police have the ability to misrepresent certain facts during interrogations." The court also granted the Defendants' motion with regards to the allegation of negligence.

some pictures of his wife's corpse, mocked his religion, denied him access to legal counsel, deprived him of food and sleep, threatened him, and lied in the Application for Probable Cause.

Longtin further argued that the Department and the Officers failed to take proper steps to release him more promptly after they discovered the exculpatory evidence. He argued that the officers ignored evidence of similar crimes in the area, ignored evidence of a suspicious person in the area, and failed to disclose exculpatory evidence to Longtin. Longtin submitted that the officers had already made up their mind that he was the culprit, and would do anything to extract a confession from him.

Finally, as part of his "pattern or practice" claim, Longtin introduced evidence that the policies, training, and practices of the Police Department were partially to blame:

> [Longtin] set forth evidence through Detective Herndon that sleep deprivation was a "tool" of investigation that he had been trained to use. Admitted into evidence was an interview and interrogation training manual of the Prince George's County Community Police Institute that told officers they could read a suspect his rights "or wait until after he admits." The manual stated that the interrogator should consider handcuffing an angry suspect to the wall "and let [him] sit a while." Officers were advised to "wait out" a passive suspect because "few people can keep it up." If a suspect "is so convincing that you are starting to believe him ... [l]eave the room [and] [d]on't go back unless you re-fortify your conviction that he is guilty." Detective Kerry Jerningan testified that it was departmental policy that police did not necessarily have to take the suspect before a district court commissioner within 24 hours if the suspect was continuously providing information, and confirmed that a police training manual described Md. Rule 4–212(f)(1) as "[a] Maryland procedural rule, not law" that could be waived.

*Longtin,* 190 Md.App. at 113–14, 988 A.2d at 29–30 (footnote omitted).

The case was submitted to the jury on eight counts,[10] and on August 31, 2006, the jury returned a verdict in favor of Longtin on all eight counts.[11] The jury awarded $5.2 million in compensatory damages against the County, pursuant to Md.Code (1974, 2006 Repl.Vol.) Section 5–303(b)(1) of the Courts and Judicial Proceedings Article ("CJP"), which provides, with certain exceptions, that "a local government shall be liable for any judgment against its employees for damages resulting from tortious acts or omissions. . . ."[12] The jury also

---

**10.** Besides the counts that were disposed of by motions for summary judgment, the count involving declaratory judgment was dropped. Before trial, counsel for Longtin stated that "I don't believe you [have to address it.] I think the Court is in a position to hear the evidence, and then after the case, if there is something left to be adjudged through a declaratory judgment, the Court can issue its judgment at that time." The Court agreed at that time to delay consideration of the declaratory judgment count. After that point, the Court did not address it further, and neither party has since raised the issue. Thus, like the Court of Special Appeals, we will treat the issue as having been abandoned. *See Prince George's County v. Longtin,* 190 Md.App. 97, 108 n. 9, 988 A.2d 20, 26 n. 9 (2010) *("Longtin ").*

**11.** The Court of Special Appeals described the details of the verdict:
The verdict sheet consisted of special interrogatories on each defendant's liability, an entry for a general verdict for compensatory damages, and entries with respect to each defendant's liability for punitive damages. According to this verdict sheet, Prince George's County was found liable for two constitutional violations: the Article 24 count and the pattern and practice claim. Each of the remaining individual defendants was also found liable for two constitutional violations (Article 24 and civil conspiracy), as well as false imprisonment, intentional infliction of emotional distress, and privacy invasion/false light. Detective Herndon was also found liable for false arrest and malicious prosecution. With respect to the common law torts, the jury specifically found that each individual defendant "acted with malice." In addition, the jury found that each officer acted "intentionally" in violation of Longtin's constitutional rights and in inflicting emotional distress.
*See Longtin,* 190 Md.App. at 107 n. 7, 988 A.2d at 25 n. 7 (2010).

**12.** The drafters of the LGTCA wanted to "ensur[e] that the financial burden of compensation is carried by the local government ultimately responsible for the public officials' acts." *Faulk v. Ewing,* 371 Md. 284, 298, 808 A.2d 1262, 1272 (2002) (citations omitted). *See also Baltimore*

returned punitive damages over $1 million against the individual officers.

The Defendants appealed to the Court of Special Appeals, which affirmed the Circuit Court's decision. The Defendants then sought *certiorari* from this Court, which we granted.

## DISCUSSION

### I. Whether the LGTCA's Notice Requirements preclude Longtin's claim.

■ The first issue raised by the Defendants involves the requirements of the Local Government Tort Claims Act. The Defendants argue that Longtin failed to comply with the notice requirements of the LGTCA, and that his claims should therefore be precluded. One way the LGTCA protects local governments is through the notice provisions of CJP Section 5–304, which states:

> ... An action for unliquidated damages may not be brought against a local government or its employees unless the notice of the claim required by this section is given within 180 days after the injury.... [T]he notice shall be given in person or by certified mail, return receipt requested.... The notice shall be in writing and shall state the time, place, and cause of the injury.

CJP § 5–304. This requirement was designed to assist local governments in their handling of potential claims:

> [The notice requirements] are intended to apprise a local government of its possible liability at a time when it could conduct its own investigation, i.e., while the evidence was still fresh and the recollection of the witnesses was undiminished by time, sufficient to ascertain the character and extent of the injury and its responsibility in connection with it.

*Police Dep't v. Cherkes,* 140 Md.App. 282, 323, 780 A.2d 410, 434 (2001) (local governments "can no longer raise that defense to escape the statutorily imposed duties to defend and indemnify.").

*Rios v. Montgomery County,* 386 Md. 104, 126–27, 872 A.2d 1, 14 (2005) (*citing Faulk v. Ewing,* 371 Md. 284, 298–99, 808 A.2d 1262, 1272 (2002); *Williams v. Maynard,* 359 Md. 379, 389–90, 754 A.2d 379, 385 (2000); *Jackson v. Bd. of County Comm'rs,* 233 Md. 164, 167, 195 A.2d 693, 695 (1963)) (quotation marks and citations omitted).

■ Compliance with the notice requirement is "a condition precedent to maintaining an action against a local government or its employees to the extent otherwise not entitled to immunity under the LGTCA." *Rios,* 386 Md. at 127, 872 A.2d at 14 (*citing Faulk,* 371 Md. at 304, 808 A.2d at 1276; *Grubbs v. Prince George's County,* 267 Md. 318, 320–21, 297 A.2d 754, 755–56 (1972)). We have denied relief to injured parties for the failure to provide adequate notice to the defendant local government. *See, e.g., Heron v. Strader,* 361 Md. 258, 761 A.2d 56 (2000) (claims of false arrest and false imprisonment precluded for failure to file timely notice); *Williams v. Maynard,* 359 Md. 379, 754 A.2d 379 (2000) (dismissing negligence claim for failure to file notice).

■ The statute, however, also affords relief from strict application the notice requirement. Section 5–304(d) provides:

Notwithstanding the other provisions of this section, unless the defendant can affirmatively show that its defense has been prejudiced by lack of required notice, upon motion and for good cause shown the court may entertain the suit even though the required notice was not given.

By the language of the statute, the burden is on the claimant first to show "good cause." Then, if the local government cannot "affirmatively show that its defense has been prejudiced by lack of required notice," the court "may" hear the case despite the faulty notice. This "good cause" exception leaves the courts some discretion in enforcing the notice requirement, and allows a court, in certain circumstances, to avoid an unjust result.

In this case, Longtin provided notice to the Defendants in a letter dated October 31, 2000, and apparently received by the defendants one week later, which read as follows:

Pursuant to [CJP] § 5–304, Mr. Longtin hereby gives notice that he suffered injuries to his person and his property and was denied important rights guaranteed to him under the United States Constitution when he was arrested on October 5, 1999 by the Prince George [sic] County Police Department, and thereafter incarcerated in Prince Georges County for a period of months for a murder he clearly did not commit.

After Longtin filed his complaint, the Defendants requested summary judgment on the grounds that he had failed to comply with the LGTCA's notice requirements. The Defendants argued that the 180–day window began on the day of Longtin's arrest, October 5, 1999, which was over a year before Longtin provided notice. The County thus argued that Longtin's notice was untimely with regard to all but one of Longtin's claims.[13]

In response, Longtin argued that the 180–day notice period did not commence until later, either when Longtin was released from jail or when he discovered the exculpatory DNA evidence. Longtin also argued that any failure to comply with the time requirement should be excused, because the Defendants suffered no prejudice and that his imprisonment and delay in learning the extent of the Defendants' actions provided good cause.

After hearing argument, the Circuit Court denied Defendants' motion, finding "[no] prejudice." This ruling—presumably made under the "good cause" exception[14]—was challenged on appeal by the Defendants.

---

**13.** The Defendants conceded that, even under their view, notice of the claim of malicious prosecution was timely because it would not have began to run until Longtin was released from prison, a much later date.

**14.** The Court of Special Appeals classified the trial court's ruling on the notice issue as a ruling on "good cause":

Although not raised by "motion" as contemplated by subsection (d), Longtin, in repeated filings, sought to invoke the good cause exception, and the circuit court, by explicitly finding no prejudice to the appellants, clearly relied upon § 5–304(d) in rejecting their notice of claim defense.

In the intermediate appellate court, the Defendants criticized the Circuit Court's ruling as inconsistent with the "earmarks of good cause" established in *Heron*, and recited in *Wilbon v. Hunsicker*, 172 Md.App. 181, 913 A.2d 678 (2006) and *White v. Prince George's County*, 163 Md.App. 129, 877 A.2d 1129 (2005). As explained in these three cases, the factors a court usually considers are:

▪ excusable neglect or mistake (generally determined in reference to a reasonably prudent person standard), [2] serious physical or mental injury and/or location out-of-state, [3] the inability to retain counsel in cases involving complex litigation, ... [4] ignorance of the statutory notice requirement, or (5) misleading representations made by representative of the local government.

*Wilbon*, 172 Md.App. at 206, 913 A.2d. at 693, *citing Heron*, 361 Md. at 271, 761 A.2d at 62–63; and *White*, 163 Md.App. at 152, 877 A.2d at 1141–42 (quotation marks and citations omitted). According to the Defendants, Longtin failed to qualify under the "exclusive" list of factors established in *Heron*, *Wilbon* and *White*.

In response, Longtin presented six alternative theories: (1) the court properly waived the notice requirement for "good cause"; (2) the trial court's denial of the County's motion for summary judgment was not preserved for appeal; (3) notice was timely with regards to *one* count—the malicious prosecution claim—and the timeliness of that claim preserves the full amount of the jury award under a "general verdict" theory; [15]

---

*Longtin*, 190 Md.App. at 122, 988 A.2d at 35. We agree with this characterization.

**15.** The Court of Special Appeals summed up Longtin's "general verdict" theory, and its inapplicability in Maryland, in a footnote:

Under [the "general verdict"] doctrine, where several counts are tried, a general verdict will be sustained if any one count is supported by substantial evidence and is unaffected by error. *See* 5 Am.Jur.2d *Appellate Review* § 776 (2007). Thus, he argues that we need only find this malicious prosecution claim to be timely to uphold the entire compensatory damage award. Although the general verdict rule may be a useful rule of appellate jurisprudence in other jurisdictions, it is

(4) Longtin substantially complied with the notice requirements; (5) the notice requirement does not bar *constitutional* claims; and (6) Prince George's County waived its governmental immunity through its Charter.

Judge Robert Zarnoch, writing for the Court of Special Appeals ("CSA"), first recognized the "uneasy fit" between the LGTCA's notice requirements and state constitutional torts:

> The Court of Appeals has consistently said that the LGTCA and the Maryland Tort Claims Act (MTCA) do not exclude State constitutional torts from their coverage. Less clear is whether the restrictions of those statutes that would defeat all or partial recovery apply in every respect to State constitutional torts.
>
> On the one hand, the Court of Appeals has said that a State constitutional tort, such as one premised on a violation of a "self-executing" constitutional provision, like Article 24 of the Maryland Declaration of Rights, is enforceable in a common law action for damages. In addition, State constitutional tort action cannot be defeated by the assertion of official or local government immunity. Thus, it appears to exist independently of the LGTCA, which is premised on a waiver of governmental immunity.
>
> On the other hand, at least in MTCA cases, the Court of Appeals has indicated that recovery against the State is available as long as the claimant complies with procedural requirements of the Act.

*Longtin,* 190 Md.App. at 117–19, 988 A.2d at 32–33 (quotation marks and citations omitted) (App.16–18). The CSA ultimately declined to reach the constitutional issue, in recognition of a

---

not the law in Maryland. Like federal caselaw, Maryland follows the rule that when one claim is overturned in a multiple claim case with a general jury verdict, an appellate court cannot possibly determine which part of the award was apportioned among the claims and a new trial must be ordered. *See Batson v. Shiflett,* 325 Md. 684, 737–38, 602 A.2d 1191 (1992); *Pantazes v. Pantazes,* 77 Md.App. 712, 726, 551 A.2d 916 (1989).

*Prince George's County v. Longtin,* 190 Md.App. 97, 121 n. 33, 988 A.2d 20, 34 n. 33 (2010) (some citations omitted).

court's "obligation to avoid unnecessarily deciding constitutional questions[.]" *Id.* (*citing Davis v. State,* 294 Md. 370, 377, 451 A.2d 107 (1982)). Instead, it "believe[d] the notice of claim issue can be resolved on the much narrower ground decided by the circuit court, *viz.* that good cause existed to excuse timely compliance with regard to each of Longtin's claims." *Id.* at 122, 988 A.2d at 34–35.

The Court of Special Appeals then reached the "good cause" exception, assuming that the notice actually provided by Longtin was, or could have been, untimely. *See Longtin,* 190 Md.App. at 124, 988 A.2d at 35–36. It distinguished the three cases relied on by the Defendants in which a "good cause" claim was rejected:

> [*Heron, White,* and *Wilbon* ], have little in common with the situation presented here. Longtin was not charged with burglary or a disorderly conduct offense, but murder in the first degree with the possibility of a double life sentence. Unlike *Heron,* he was not quickly released. Unlike *White,* he was not justifiably incarcerated, complaining of an ancillary constitutional violation. Longtin alleged and the jury found that agents of the County lied and withheld exculpatory DNA evidence to keep him incarcerated. If we assume that the 180–day notice period for most of the tort claims ran from the date he was arrested, he was not released until more than two months after the statutory period had expired....

*Longtin,* 190 Md.App. at 124, 988 A.2d at 35–36. The intermediate appellate court thus concluded that any untimeliness in Longtin's notice was excusable:

> In short, an "ordinary prudent person" in Longtin's position could not have given notice by the 180th day. Thus, we conclude that, even if notice on any or all of Longtin's claims against the County and the individual appellants were untimely, the circuit court did not abuse its discretion in finding that good cause existed to excuse any delay.

*Id.*

■ We believe that the notice issue is better resolved, when possible, on the timeliness of the notice than on the

"good cause" exception. *See Heron,* 361 Md. at 262, 761 A.2d at 58 (Before reaching the good cause exception, "it is necessary, first, to determine the time of his alleged injury for each of the appealed claims."). Longtin argued in the Circuit Court that his notice was timely because he sent his letter within 180 days after his release from prison, and although that court rested its decision on lack of prejudice, both arguments are preserved. *See* Md. Rule 8–131 (appellate courts may hear only those issues which "have been raised in or decided by the trial court").

The parties agree that if the 180–day notice period began on October 5, 1999, the day of Longtin's arrest, then his notice was untimely, but if the period began on June 13, 2000, his release date, or any point after, Longtin's notice would be timely. We may resolve this issue, therefore, by determining, as a matter of law, when Longtin's 180–day notice period began. We will first examine the notice issue with respect to the false arrest and imprisonment claims, and then turn to the remainder of Longtin's counts.

### A. *Notice Period for False Arrest and Imprisonment*

We start with an examination of *Heron,* which was also a false arrest case. *See Heron,* 361 Md. 258, 761 A.2d 56 (2000). The plaintiff in that case, David Heron, had been arrested by the Prince George's County police on August 24, 1997, for resisting arrest, obstructing the police, and disorderly conduct. Heron was released from prison on August 26, 1997,[16] and later acquitted of all charges. In May of 1998, about two months after his acquittal, Heron provided a Notice of Claim to Prince George's County, alleging false imprisonment, false arrest, and malicious prosecution. Prince George's County filed a motion to dismiss the complaint, asserting that the notice was untimely as it was provided more than 180 days

---

**16.** The docket entries in Heron's criminal case, number 1–E–00079311 in Prince George's County, show that he was committed on August 24, 1997, and released on August 26, 1997. *See also Longtin,* 190 Md.App. at 124, 988 A.2d at 35 (the *Heron* defendant was "quickly released").

from the date of arrest. *See id.* at 262, 761 A.2d at 58. The circuit court granted the motion to dismiss, and the issue eventually reached this Court. We explained that LGTCA's notice period begins when "his causes of action arose, i.e., when the legally operative facts permitting the filing of [his claims] came into existence[,]" or "when facts exist[ed] to support each element." *Id.* at 264, 761 A.2d at 59. For the false arrest and false imprisonment claims, we held that the plaintiff's "injuries for the purposes of the LGTCA therefore occurred, on August 24, 1997, the date he was arrested and detained by the police. The facts alleged to support each element of his claim were in existence at that time." *Id.*

At first glance, this conclusion might seem to support the Defendants' claim that the 180–day period began on October 5, 1999, the date of Longtin's arrest. Closer inspection of the case suggests otherwise. Unlike Longtin, Heron was in prison for only two days. There was no need to distinguish between the date of arrest and the date of release; whichever was used, the notice was too late. Instead, the distinction important in *Heron* was between the date of arrest (and release), and the much later date when the defendant was acquitted. This is true for the few cases cited in *Heron* which used a "date of arrest" rule; the plaintiff had been imprisoned for a short period of time, and the court had to distinguish between the earlier date of arrest/release and the later date of acquittal or dismissal of the charges. *See Michaels v. New Jersey,* 955 F.Supp. 315, 327 (D.N.J.1996) (distinguishing date of arrest from date that court proceedings terminated); *Pisano v. City of Union City,* 198 N.J.Super. 588, 487 A.2d 1296 (Law Div.1984) (claimant was released on bail); *Deary v. Three Un–Named Police Officers,* 746 F.2d 185 (3rd Cir.1984) (plaintiff released on bail the same day as arrest); *see also Livingston v. Consolidated City of Indianapolis,* 398 N.E.2d 1302 (Ind.Ct.App.1979) (interpreting the Indiana Tort Claims Act's 180–day notice requirement as beginning on the day Livingston was arrested, charged, and released from custody.).

Moreover, the *Heron* court cited with approval multiple decisions which identified **the date of release** as the date a

false arrest or false imprisonment claim accrues. *See Heron,* 361 Md. at 266–69, 761 A.2d at 60–63. These cases include *Collins v. County of Los Angeles,* 241 Cal.App.2d 451, 50 Cal.Rptr. 586, 588 (1966) (100–day period of California Tort Claims Act began on the day the imprisonment terminated); *Ragland v. New York City Hous. Auth.,* 201 A.D.2d 7, 613 N.Y.S.2d 937, 939 (1994) ("The petitioner's claim sounding in false arrest [and false imprisonment] accrued on [the date] on which he was released from custody."); *Boose v. Rochester,* 71 A.D.2d 59, 421 N.Y.S.2d 740 (N.Y.App.Div.1979) (notice was untimely because it was given more than 90 days after arrestee's confinement terminated); *Allee v. New York,* 42 A.D.2d 899, 347 N.Y.S.2d 708 (N.Y.App.Div.1973) (cause of action for false arrest and imprisonment arose at the time of plaintiff's actual physical release from confinement).

The New York courts, cited extensively in *Heron,* have occasionally used the "date of arrest" rule, but reaffirmed that it is the date of release that matters when dealing with a prolonged pretrial detention. *See Collins v. McMillan,* 102 A.D.2d 860, 477 N.Y.S.2d 49 (1984) (three week detention); *Bennett v. New York,* 204 A.D.2d 587, 612 N.Y.S.2d 201 (1994) (four month detention). In both *Collins* and *Bennett,* the courts faced a similar situation to Longtin's, in that the plaintiffs were held in prison for a prolonged period, but released before trial. Those courts faced a similar interpretative choice: if the notice period commenced on the *arrest date,* the notice was untimely, but if it commenced on the *release date,* weeks or months later, the notice was timely. Those courts selected the latter date. *See Collins,* 477 N.Y.S.2d at 50 (90–day notice period began on his date of release); *Bennett,* 612 N.Y.S.2d at 201 ("In an action for false arrest or false imprisonment ... [the notice period] commences on the day the plaintiff is released from actual custody."). In *Heron's* reliance on analogous New York cases, we discern an implicit recognition that when a person is arrested, imprisoned, and released without a trial, the notice period for a false arrest and imprisonment claim begins on release.

■ We are also guided by false arrest and imprisonment cases involving the accrual date for the statute of limitations. Although the notice requirement and a statute of limitations are not perfectly convergent,[17] their policies of protecting defendants against stale claims are similar. *Compare Philip Morris USA, Inc. v. Christensen*, 394 Md. 227, 247–48, 905 A.2d 340, 352 (2006) (*citing American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974)) (Statutes of limitations "are intended to give notice of suit to defendants within a reasonable amount of time to prevent loss of evidence and the fading of witnesses' memories[.]") *with Smith v. Danielczyk*, 400 Md. 98, 112, 928 A.2d 795, 804 (2007) (purpose of the LGTCA's notice requirement is "to apprise local governments of possible liability at a time when they can conduct their own investigation into the relevant facts, while evidence and the recollection of witnesses are still fresh."). For this reason, the accrual date for a statute of limitations period is relevant in determining the accrual date of a notice period for the same claims. *See, e.g., Roehrig v. Louisville*, 454 S.W.2d 703, 704 (Ky.Ct.App.1970) (notice period for contribution claim begins when statute of limitations for such a claim would); *Bryant v. City of Lafayette*, 946 P.2d 499 (Colo.Ct.App.1997) (like a statute of limitations, tort claims notice period for automobile accident was tolled by "discovery rule" during plaintiff's prolonged period of unconsciousness); *C & G, Inc. v. Canyon Highway Dist. No. 4*, 139 Idaho 140, 75 P.3d 194, 198 (2003) (examining "notice period" cases to identify statute of limitations for inverse condemnation); *Espanola Housing Authority v. Atencio*, 90 N.M. 787, 568 P.2d 1233, 1236 (1977) (recognizing the similarity between notice statutes and statutes of limitation); *Emery v. University of New Mexico Medical Ctr.*, 96 N.M. 144, 628 P.2d 1140 (App.1981)

---

**17.** Not every contour of limitations jurisprudence is applicable to the LGTCA's notice requirements. For example, in *Heron v. Strader*, 361 Md. 258, 761 A.2d 56 (2000), we cited favorably to *District of Columbia v. Dunmore*, 662 A.2d 1356, 1359 (D.C.1995), which rejected the application of the discovery rule to the D.C. notice period for tort claims. *Heron*, 361 Md. at 267 n. 5, 761 A.2d at 60 n. 5.

(linking start of notice period to start of statute of limitations period in medical malpractice case); *Adams v. Oregon State Police,* 289 Or. 233, 611 P.2d 1153, 1156 (1980) (in tort case involving a damaged car, the 180-day notice period and two-year period of limitations commenced on the same day).

■ The general rule for false arrest and imprisonment cases in which a person is arrested and released prior to trial is that "the statute begins to run only when the imprisonment ends, since the period of imprisonment is treated as a unit." 4 Restatement (Second) of Torts § 899, Comment c; *see also Hackler v. Miller,* 79 Neb. 206, 112 N.W. 303 (1907) ("The plaintiff's cause of action arose on the instant of his arrest, and the statute of limitations, which is of one year ... began to run the moment he was set at liberty."); *Kirwan v. State,* 31 Conn.Supp. 46, 320 A.2d 837, 840 (1974) (same); *Belflower v. Blackshere,* 281 P.2d 423, 425 (Okl.1955) (same); *Mobley v. Broome,* 248 N.C. 54, 102 S.E.2d 407, 409 (1958) (same) *overruled on other grounds by Fowler v. Valencourt,* 334 N.C. 345, 435 S.E.2d 530 (1993); *O'Fallon v. City of Burlington,* 427 N.W.2d 809, 811 (N.D.1988) (same); *Adler v. Beverly Hills Hosp.,* 594 S.W.2d 153, 156–57 (Tex.Civ.App.1980) (same); *Stafford v. Muster,* 582 S.W.2d 670 (Mo.1979) (same).[18]

---

**18.** The dissent disagrees with our approach, stating that it "permits a cause of action to accrue long after the legal elements materialized." The dissent has failed to observe that the common law's treatment of false arrest and imprisonment claims is an exception to the general rule that a claim accrues when the legal elements materialize. *See Wallace v. Kato,* 549 U.S. 384, 388, 127 S.Ct. 1091, 1095, 166 L.Ed.2d 973 (2007). The Supreme Court in *Wallace* acknowledged the general rule regarding accrual of claims, but then stated:

There is, however, a refinement to be considered, arising from the common law's distinctive treatment of the torts of false arrest and false imprisonment.... The running of the statute of limitations on false imprisonment is subject to a distinctive rule—dictated, perhaps, by the reality that the victim may not be able to sue while he is still imprisoned: Limitations begin to run against an action for false imprisonment when the alleged false imprisonment ends.

*Id.* at 388–89, 127 S.Ct. at 1095, 127 S.Ct. 1091. As the cases cited *infra,* in the text, reveal, this rule has long since been accepted by courts and commentators, and the dissent provides little justification to depart from it.

To be sure, concerns over stale claims should limit applicability of the "release date" rule in cases in which the plaintiff's imprisonment continues from the arrest to trial and beyond. For example, in a series of cases where the plaintiff has been arrested, held, tried, and convicted, only to be released years later, courts have commenced the statute of limitations at the formal start of criminal proceedings. *See, e.g., Wallace v. Kato,* 549 U.S. 384, 390–92, 127 S.Ct. 1091, 1096–97, 166 L.Ed.2d 973 (2007) (statute of limitations for false imprisonment claim "commenced to run when [plaintiff] appeared before the examining magistrate and was bound over for trial[,]" and not when the plaintiff was released five years later, after his conviction was overturned on appeal); *Johnson v. Blackwell,* 885 N.E.2d 25, 31 (Ind.Ct.App.2008) (cause of action accrued when defendant was bound over for trial in March 2003, and not when he was arrested in February 2003 or when he was released in 2006). In these cases, using the "release date" as the operative date for limitations would have allowed for stale claims to be brought years after the subject events.

When, however, a defendant is imprisoned while awaiting trial, but never tried, there is sound policy for commencing the notice period upon a plaintiff's release from prison.[19] A falsely imprisoned person's failure to immediately initiate a civil tort claim is not usually caused by neglect or imprudence, but instead by **"the reality that the victim may not be able to sue while he is still imprisoned."** *Wallace v. Kato,* 549 U.S. 384, 389, 127 S.Ct. 1091, 1095, 166 L.Ed.2d 973 (2007). Severe limitations are (rightfully) placed on a prisoner's ability

---

**19.** In contrast, the dissent's approach would create perverse policy incentives for the State. When the State takes the appropriate action and releases a prisoner after probable cause has disappeared, the dissent's "date of dissipation" is indistinguishable from our "release date" rule. Under the "date of dissipation" rule, however, the State is rewarded for keeping a prisoner *after it has lost its legal justification for doing so.* If the State continues the false imprisonment past that point, the clock continues to run on the prisoner's notice period, and it is less likely that the prisoner will file timely notice. The dissent's rule could encourage such action.

to communicate with the outside world, and his first few months in prison are presumably spent in preparation for the criminal proceedings. To the extent that a notice period—or a statute of limitations—is directed at those who sit on their rights, it should not run during pretrial imprisonment.[20]

██ Moreover, when a plaintiff is held for weeks or months, but released before trial, commencing the notice period on release does not endanger the policy of preserving a municipality's ability to "conduct their own investigation into the relevant facts, while evidence and the recollection of witnesses are still fresh." Notice periods are concerned with the potential that a municipality will be forced to defend itself against injuries it did not know existed, at a time when it is unable to generate evidence to assist in that defense. There is less risk of this in a false arrest/false imprisonment case which has not

---

20. The approach adopted by the dissent, although adhering to the general rule regarding accrual of a cause of action, causes more problems than it solves. The dissent attempts to identify the moment at which the "legal justification [for the arrest] dissipated." The dissent readily identifies Longtin's "date of dissipation," but in other cases this approach may be an unsustainable endeavor. Here, the exclusion of Longtin's DNA might have been conclusive, but in other cases the failure to identify a defendant's DNA at the crime scene may not be. Furthermore, the police may have non-DNA evidence which justifies a continued imprisonment, or have no scientific evidence whatsoever. In those cases, when probable cause is destroyed is a fact-intensive issue, requiring weighing of evidence that is inappropriate for an appellate court. Moreover, the "date of dissipation" will be heavily disputed by the State, who may always be able to provide a theory to justify continued imprisonment.

Even in this case, which has definitive scientific evidence, the "dissipation" test becomes murky. To identify the moment probable cause *arose*, the dissent selects certain facts from the record, none of which were included in the State's own Statement of Probable Cause. The dissent then concludes that probable cause arose prior to Longtin's interrogation, contradicting even the State's account. Troublingly, the dissent has resolved these disputed factual issues in a way unfavorable to Longtin, who was victorious at trial. *See, e.g., Hoffman v. Stamper,* 385 Md. 1, 10, 867 A.2d 276, 282 (2005) ("We must view that evidence in a light most favorable to the part(ies) who prevailed on the issues to which it relates[.]"). The dissent has disregarded our standard of review and attempted to resolve contested factual issues in a manner contrary to the jury's verdict.

yet gone to trial. From the moment of arrest, police officers are required to document their actions and create evidence (e.g., the statement of probable cause). While that person is imprisoned, the municipality is presumably gathering evidence, organizing its facts, and identifying potential witnesses to justify that arrest and detention. Notice periods serve to open up the flow of evidence from a potential plaintiff to a local government, and jump start the government's legal defense mechanism. When a party is falsely imprisoned, and already locked in an adversarial proceeding with that government (indeed, one with much higher stakes), the government's engine is revved up. Because of the speedy trial laws, commencing a notice period on the end of *pretrial* imprisonment will not risk the lengthy delays that render evidence, and claims, stale.[21]

■ We hold that when a person is arrested, imprisoned, but released before trial, in order to file a false arrest and imprisonment claim, he must file his notice of claim within 180 days of his release from prison. Longtin did, and he therefore complied with the LGTCA's notice requirements.

The dissent reaches the same conclusion, although through application of the LGTCA's "good cause" exception. See Dissenting Op. at 509, 19 A.3d at 894. Allowing "good cause" for incarceration creates even more problems in future cases. First, it is unclear how long imprisonment will continue to be "good cause" for late filing; should courts forgive longer imprisonments, and allow late notice from defendants who are freed years after conviction? If incarceration is not always "good cause", how will the court determine which imprisonments are, and which are not? Moreover, if the defendant is imprisoned on *another* charge, is his failure to file notice any less forgivable than Longtin's? The many issues raised by the dissent's "good cause" approach have long since been solved

---

**21.** As this case never reached trial, we need not decide at what point, after the trial, a person who is imprisoned must initiate a civil law suit.

by the common law's treatment of false arrest and imprisonment claims.

## B. Notice For Longtin's Other Claims

■■■ Our resolution of the notice issue for false arrest and imprisonment resolves the notice issue for most of Longtin's claims. In general, constitutional claims arising from a false arrest and imprisonment—including pattern or practice claims—share a statute of limitations accrual date with the related common law torts. *See Wallace v. Kato,* 549 U.S. 384, 389, 127 S.Ct. 1091, 1095, 166 L.Ed.2d 973 (2007) (statute of limitations in federal claim for damages resulting from arrest and alleged violations of the Fourth Amendment are drawn by analogy from the torts of false arrest and false imprisonment). Civil conspiracy claims, moreover, share a statute of limitations with the underlying tort. *See, e.g., Nader v. Democratic Nat'l Comm.,* 567 F.3d 692, 697 (D.C.Cir.2009) ("a civil conspiracy claim incorporates not only every substantive element of the underlying tort, but also its statute of limitations.") As all these claims would share an accrual date for limitations purposes with false arrest and imprisonment, the same should hold true for a notice period.[22]

The only remaining claims, then, are the counts for Intentional Infliction of Emotional Distress ("IIED") and Invasion of Privacy/False Light. With regard to the IIED claim, at least one court has held that the *statute of limitations* for an IIED claim accrued earlier than the date of false arrest and imprisonment. *See Johnson v. Blackwell,* 885 N.E.2d 25 (Ind.C.A.2008). In *Johnson,* the Court of Appeals of Indiana applied *Wallace v. Kato* and concluded that the plaintiff's

---

**22.** The dissent characterizes our approach as "one size fits all," complaining that we have failed to examine each cause of action separately. With regard to the constitutional torts and the civil conspiracy claim, we concede the point. Indeed, for those torts, a "one size fits all" approach is inevitable, because those accrual dates are linked to the accrual date of the underlying tort, i.e. false arrest and imprisonment. This is well established, and the dissent provides no reason to break that link.

"cause of action for false imprisonment/false arrest accrued when he was bound over for trial in March 2003[.]" *Id.* at 31. The court then observed that the related IIED claim was based entirely upon the search of his home, on the date of arrest, and concluded that the IIED claim accrued on that date.

In a recent case, however, the Seventh Circuit distinguished *Johnson* on the grounds that the plaintiff's IIED claim was based on events *occurring throughout the imprisonment. Parish v. City of Elkhart,* 614 F.3d 677, 683 (7th Cir.2010). After a criminal defendant's conviction was overturned, he sued the officers and the police department for, *inter alia,* intentional infliction of emotional distress. The Court held that the claim did not accrue *until the conviction:*

> The officers allegedly took steps through all stages of the investigation and trial that cumulatively amounted to the tort of IIED. Additionally, the conviction was an essential piece of this tort because it was the wrongful conviction that led to the emotional strain and mental anguish that Parish faced.... Parish's claim of IIED was not complete prior to the time of conviction because the conviction was the crux of the claim.

*Id. Parish* clarifies that the accrual date of an IIED claim can range, depending upon the alleged actions. In this case, as in *Parish,* the claim is not based entirely on the police officers' actions during the arrest. Rather, Longtin alleged that his emotional distress was the result of continuing actions by the police department to keep him wrongfully imprisoned. His *continued wrongful imprisonment* was the "crux of his claim." The notice period for the IIED claim, therefore, did not accrue until his release.

A closer question is the accrual date for Longtin's false light claim. Some courts considering the statute of limitations for an array of claims similar to Longtin's have distinguished between privacy claims and the false arrest and imprisonment claims. *See, e.g., Price v. City of San Antonio,* 431 F.3d 890, 893–94 (5th Cir.2005) (invasion of privacy claim

accrued on date of arrest, while false arrest and imprisonment claims accrued later); *Johnson,* 885 N.E.2d at 31 (same). Although this distinction may be meaningful in some factual circumstances, we decline to differentiate the notice period accrual date for a "false light" claim arising from a false statement of probable cause. The false light claim arises from the assertions contained in the Statement of Probable Cause. This same event underlies multiple other counts, including the false arrest and imprisonment claims, for which the notice period commenced upon release. Under these circumstances, the policy of the notice requirement is not further served by requiring a falsely imprisoned person to file earlier notice of the false light claim. We decline, therefore, to distinguish the applicable notice period for the false light claim from Longtin's other claims.

## II. LGTCA's Damage Caps

To increase predictability, and provide an upper limit to a local government's potential liability, the LGTCA limits the amount a tort plaintiff can recover from a local government to $200,000 per individual claim and $500,000 per total claims arising from the same occurrence. *See* CJP § 5–303(a)(1). The jury awarded Longtin $5,025,000, a sum well in excess of the limits provided in the LGTCA. The trial court refused to lower the award, an issue the Defendants challenge on appeal. We must decide, therefore, whether the LGTCA's cap on damages applies in this case so as to limit the permissible award.

The timeline of Longtin's arrest, detention, release, and civil suit, overlays a period of significant development of the LGTCA's damage cap provisions, beginning with this Court's opinion in *Housing Auth. v. Bennett,* 359 Md. 356, 754 A.2d 367 (2000). There, a plaintiff sued the Housing Authority of Baltimore City for damages caused by her childhood lead poisoning. The plaintiff alleged that the Housing Authority was "negligent in allowing flaking lead-based paint to remain [in her home,]" and sought several million dollars of damages. *See id.* at 364, 754 A.2d at 371. The Authority filed a motion in Court to limit their potential liability to $200,000, which the

Circuit Court granted. The applicability of the damage caps was raised on appeal, among other issues.

The version of the LGTCA in front of this Court contained the following damages limitation:

(a) *Limitation on liability*—(1) ... the liability of a local government may not exceed $200,000 per an individual claim, and $500,000 per total claims that arise from the same occurrence for damages resulting from tortious acts or omissions, **including liability arising under subsection (b)** of this section. . . .

(b) *When government liable*—(1) ... a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government.

Md.Code (1974, 1998 Repl.Vol., 1999 Cum.Supp.), CJP § 5–303 (emphasis added). Section (a) thus capped the damages available against a local government, *including respondeat superior* liability, which was identified in subsection (b).

Because *Bennett* did not deal with a suit under *respondeat superior,* but instead involved a direct suit against the Housing Authority, the parties disputed whether the word "including" signified that the damages caps were intended to apply outside of claims of *respondeat* liability. *See Bennett,* 359 Md. at 370, 754 A.2d at 374. The Housing Authority argued that a cap which "includes" *respondeat superior* liability within its coverage necessarily includes some other type of liability, such as direct liability. Not persuaded by this argument, this Court adopted the plaintiff's interpretation, holding that the statute did not apply to direct suits:

In the context of the LGTCA, we do not believe that the monetary limitation, by use of the word "including" with reference to liability for judgments against employees, should be construed as also applying to *all* tort judgments directly against local governments and agencies regardless of the basis for such judgments. As previously discussed, the only liability mentioned in §§ 5–301 through 5–303 is liability to provide a defense in tort actions against employ-

ees, liability to pay judgments in tort actions against employees, and liability to indemnify employees. Furthermore, limitations upon liability in a governmental tort claims act ordinarily relate to the liability created by or expressly dealt with in that tort claims act.

*Id.* at 373, 754 A.2d at 376. We concluded that "[i]t would not be a reasonable construction of the statutory language ... to apply the monetary caps to tort actions directly against local governments[.]" *Id.*

The *Bennett* decision caused alarm among local governments, who immediately sought corrective action from the General Assembly. In the following session, in early 2001, the General Assembly passed emergency legislation to "[clarify] that the monetary limits on the liability of a local government under the [LGTCA] apply to claims against local governments when named as defendants [and] that the monetary limits under [LGTCA] apply to tort judgments for which local governments are liable...." Chapter 286 of the Acts of 2001. The Governor signed this legislation into effect on April 20, 2001. Importantly, the General Assembly gave this revision to the LGTCA a retroactive effect, stating in an uncodified section that: "[The] Act shall apply to any claim for damages under § 5–303 of the Courts and Judicial Proceedings Article in a case pending on the effective date of this Act and **arising from events occurring on or after July 1, 1987.**" (Emphasis added).

Longtin was released from prison exactly one week after the *Bennett* decision was filed. Thus, its holding—that local governments faced unlimited liability for direct suits—was the status of the law upon his release. The question then is whether the subsequent revisions to the LGTCA apply retroactively to limit Longtin's direct claims.[23]

 It is a hallmark of our jurisprudence that retroactive legislation may not deprive a person of a "vested right."

---

**23.** Like the Court of Special Appeals, we believe the issue of the damage caps can be resolved by determining whether the caps can be applied retroactively to his claims. Deciding the issue on these grounds

*See Dua v. Comcast Cable of Md., Inc.*, 370 Md. 604, 625–630, 805 A.2d 1061, 1073–1077 (2002) (detailing over 150 years of Maryland cases which invalidated retroactive legislation to "vested rights"). Retroactive deprivation of a vested right violates "Article 24 of the Declaration of Rights and Article III, § 40, of the Constitution." *Id.* at 629–630, 805 A.2d at 1076. We must decide, therefore, whether Longtin possessed "vested rights" at the time of his release from jail. *See State Comm'n on Human Relations v. Amecom*, 278 Md. 120, 123, 360 A.2d 1, 4 (1976) (there is "no absolute prohibition against retroactive application of a statute.").

In this case, the Court of Special Appeals ruled that the "right" at issue for Mr. Longtin was his cause of action for the full amount of damages: "Here, what was at stake was a *fully* accrued cause of action for *complete* recovery for constitutional violations that were not previously subject to an assertion of either all or partial local government immunity." *Longtin,* 190 Md.App. at 128, 988 A.2d at 38.[24] The CSA concluded that this right had vested by the statutory change, and thus could not be retroactively deprived. *Id.* The Defendants object to this conclusion, and argue that Longtin had no vested right to damages above the statutory cap. In a somewhat conclusory argument, the Defendants state that the cap "resulted in no adjustment of any burden or benefit of economic life; no readjustment of such rights or burdens; no disruption of anyone's settled expectations; and no burdening of any limited class with new liabilities."

In a seminal case written by Judge Eldridge, we were called to consider whether two statutes with retroactive effect that

---

allows us to avoid the constitutional issue of whether the damage caps can apply to damages awarded for constitutional violations.

**24.** The Defendants object to this classification, classifying the LGTCA's damage caps as a "defense," the right of a local government, which remained inchoate until Longtin filed his suit, after the LGTCA was revised. The Defendants argument ignores the reality that any deprivation of a cause of action could alternatively be cast as the creation of a defense, thus depriving plaintiffs of their rights with a turn of the tongue.

limited potential recovery by a party deprived a "vested right." *Dua,* 370 Md. 604, 805 A.2d 1061. In *Dua,* the plaintiffs sought to recover from Comcast monthly late fees which they had paid to Comcast, to the extent that such fees exceeded six per cent per annum, the legal rate of interest set forth in Maryland's constitution. One of these two statutes, passed after the alleged illegal late fees were paid, established the validity of late fees in certain allowable amounts, and stated that "this Act shall apply to all late fees provided for in contracts entered into, or in effect, on or after November 5, 1995. Ch. 59 of the Acts of 2000, effective October 1, 2000." Thus, the statute purported to apply retroactively, and to limit the plaintiff's claims for late fees during the five-year retroactive period to those amounts exceeding the new statutory limit. The *Dua* plaintiffs challenged the constitutionality of this retroactive provision as depriving them of vested rights. *Dua,* 370 Md. at 611, 805 A.2d at 1065.

Holding that a "cause of action" can be the type of "vested right" constitutionally protected, the *Dua* Court said:

Although there may not ordinarily be "a constitutionally protected vested property right in a particular . . . cause of action" accruing *after* a statute limits or abrogates the cause of action, *Johnson v. Maryland State Police,* 331 Md. 285, 298–99, 628 A.2d 162, 168 (1993), there normally is a vested property right in a cause of action which has accrued prior to the legislative action. This Court has consistently held that the Maryland Constitution ordinarily precludes the Legislature (1) from retroactively abolishing an accrued cause of action, thereby depriving the plaintiff of a vested right, and (2) from retroactively creating a cause of action, or reviving a barred cause of action, thereby violating the vested right of the defendant.

*Id.* at 632–33, 805 A.2d at 1073. The *Dua* Court concluded that retroactive application of the new statutes, so as to limit liability, was unconstitutional:

Whether [the statutes] are viewed as statutes abrogating petitioners' right to particular sums of money, or as statutes

abrogating causes of action in pending cases, or as both (which is probably the most accurate description), the retrospective portions of both statutes clearly deprived petitioners of vested rights. Consequently, those portions are invalid under Article 24 of the Maryland Declaration of Rights and Article III, § 40, of the Maryland Constitution.

*Id.* at 642, 805 A.2d at 1083. Under *Dua,* vested rights protected by the Maryland Constitution include both "causes of action" and "rights to a particular sum of money."

Here, the trier of fact has determined that the plaintiff suffered injuries and deserved compensation in amount that was many multiples of the amount allowed under the statutory damages cap. Application of a damages cap deprives a person of compensation, just as abrogating a cause of action does. For this reason, most courts that have considered the issue disallowed retroactive application of a statutory damages cap. *See Socorro v. New Orleans,* 579 So.2d 931 (La.1991) (rejecting approach adopted by some lower courts in which damages over a statutory cap were viewed as mere expectancies and not "vested rights."); *Klotz v. St. Anthony's Med. Ctr.,* 311 S.W.3d 752, 760 (Mo.2010) (when a statute "purports to decrease the amount of damages a victim of medical malpractice could recover after the cause of action has accrued, this Court is bound [ ] to find the statute unconstitutional[.]"); *Blair v. McDonagh,* 177 Ohio App.3d 262, 894 N.E.2d 377, 391 (2008)("a court cannot apply [punitive damages cap] to causes of action that arose before the statute's effective date"); *Estate of Bell v. Shelby County Health Care Corp.,* 318 S.W.3d 823, 833 (Tn.2010) ("the rights of the plaintiff vest or accrue with the commission of the tort" and may not then be subjected to later damage limitations); *Gibson v. Commonwealth,* 490 Pa. 156, 415 A.2d 80 (1980) (prohibiting retroactive application of sovereign immunity statute which included damage limitations);[25] *Martin by Scoptur v. Richards,* 192 Wis.2d 156, 531

---

**25.** The *Gibson* decision specifically addressed the abrogation of certain causes of action, but also prohibited the retroactive abrogation of the

N.W.2d 70, 89–92 (1995) (retroactive application of damages cap to plaintiffs injured before enactment would impermissibly impair that right);[26] Indeed, the Supreme Court of Tennessee, in adopting this position, has already cited favorably to the Court of Special Appeal's opinion. *Estate of Bell,* 318 S.W.3d at 832 n. 16 ("The Maryland Court of Special Appeals [has] reached the same conclusion applying constitutional provisions expressly proscribing retrospective laws.").[27]

To be sure, applying a damage cap does not vitiate a person's remedy altogether. Moreover, there was no "particular" sum that Longtin had a right to when the statute was changed; it had not yet been determined by the jury. We are not persuaded, though, that these distinctions disqualify Longtin's accrued right to recover damages from the constitutional protections against retroactive application of laws. As one Florida court concluded:

statute's damage limitations. *See Commonwealth v. Twentier,* 76 Pa. Cmwlth. 537, 464 A.2d 642, 644 (1983) (affirming that *Gibson* also prohibits retroactive application of the damage limitation provision). One of *Gibson's* practical effects, regarding jurisdictional issues, was later superseded by statute, as described in *Balshy v. Rank,* 507 Pa. 384, 490 A.2d 415, 419 (1985). *Gibson's* retroactivity analysis, however, survives. *See, e.g., Konidaris v. Portnoff Law Assocs.,* 598 Pa. 55, 953 A.2d 1231, 1241–42 (2008) (citing approvingly to *Gibson* in a vested rights analysis).

26. Other courts have rejected retroactive application of a damages cap because of the legislature's failure to specifically include retroactivity in the statute. Although these statutes are distinguishable from the instant one, the discussion in these cases is helpful insofar as they demonstrate a judicial wariness towards any retroactive application of a damage cap. *See, e.g., Brewton v. White's Auto Store, Inc.,* 362 So.2d 226 (Ala.1978) (applying presumption against retroactivity to a damages cap, stating that such statutes are "excluded from judicial favor, and subjected to this strictness of judicial construction"); *State v. Daley,* 165 Ind.App. 513, 332 N.E.2d 845, 848–49 (1975) (observing legislative silence as to retroactivity, and stating, in dicta, that allowing retroactive application "would deprive Daley of a substantial portion of an existing, vested right[.]").

27. *But see County of Los Angeles v. Superior Ct. of Los Angeles County,* 62 Cal.2d 839, 44 Cal.Rptr. 796, 402 P.2d 868, 871–72 (1965) (allowing retroactive application of a law which limited municipal liability).

We see no reason why a different result should obtain [with regard to damage caps] merely because the retroactive law limits the amount of recovery and does not completely abolish the cause of action. A vested right is not any less impaired in the eyes of the law merely because the impairment is partial.

*Kaisner v. Kolb*, 543 So.2d 732, 739 (Fla.1989).[28]

Nor can we discern any logical rationale why, under our constitution, we should permit retroactive application of a statute requiring a reduction in damages recovered by a successful plaintiff when we deny retroactive abolishment of the cause of action. Our constitutional precedent recognizes that a person's rights shall not be "impaired" by later-enacted legislation. *See Allstate Ins. Co. v. Kim*, 376 Md. 276, 296, 829 A.2d 611, 622 (2003) ("As *Dua* makes clear, the standard for determining whether retroactive legislation violates Art. 24 of the Maryland Declaration of Rights or Art. III, § 40 of the Maryland Constitution is **whether it abrogates or significantly impairs** 'vested rights.'") (emphasis added). It is patent that the enormous loss to Longtin from application of the statutory cap would "impair" his cause of action. Accordingly, we agree with the Court of Special Appeals that Longtin

---

**28.** Florida's rule regarding retroactivity is more permissive than most states in that it allows the legislature to retroactively abrogate causes of action which, although accrued, have not been acted upon. *Weingrad v. Miles*, 29 So.3d 406, 412–16 (2010) (right to bring cause of action in the future is a "mere expectation.") (*citing Clausell v. Hobart Corp.*, 515 So.2d 1275 (Fla.1987)). *Weingrad's* rule has two important exceptions: the first is that a plaintiff has a vested right in *statutory* causes of action that are not based on the common law, which may not be retroactively abrogated. *Id.* at 415–16; *see also Kaisner v. Kolb*, 543 So.2d 732, 739 (Fla.1989) (waiver of sovereign immunity was statutory and thus could not be retroactively impaired). The second exception is when the claim has already been filed. *Id.* The *Weingrad* decision implicitly included, in this second category, cases in which the plaintiff had filed his notice of claim. *See id.* ("because Appellees did not **file their notice of intent to initiate litigation**, file their complaint, or obtain a judgment prior to the enactment of the statute, they had at most a 'mere expectation' or a prospect that they might recover damages[.]") (emphasis added). Longtin, who had filed his notice by the time of the statutory revision, would therefore be protected, even under Florida's rule.

had a vested right in bringing his cause of action—with no statutory cap on damages—prior to the enactment of the LGTCA revisions. Although the legislature may, in its wisdom, limit tort damages prospectively, *see, e.g., Murphy v. Edmonds* 325 Md. 342, 601 A.2d 102 (1992) (upholding statutory cap on noneconomic tort damages which applied prospectively), the constitution protects against retroactive application of these limitations. The LGTCA's limits, therefore, do not apply to the jury award in this case.

### III. Longtin's "Pattern or Practice" Claim

 The third certiorari issue was whether Maryland law recognizes a "pattern or practice" claim against a local government for unconstitutional policies and, if so, whether Longtin produced enough evidence to support such a claim.

The eighth count of Longtin's complaint—titled "Pattern or Practice of Improper Conduct," was directed at the then-police chief and the Criminal Investigations Division. It alleged that these parties "maintained a policy of unconstitutional and unlawful detention and interrogation" and that his arrest and detention were not "a single isolated, accidental, or peculiar event[.]" Longtin alleged, *inter alia:*

> ... The wrongful detention, denial of the right to counsel, and other rights as well as the coercion of confessions occurs so frequently that it has become an accepted manner by the [Police Department.] This is a result of Prince George's County's failure to establish effective procedures, rules, orders, guidelines, and practices to ensure that such violations do not occur and to ensure that allegations of such violations will be thoroughly investigated and appropriately punished when found to have occurred. As a result of this failure, there has been a regular pattern and practice of conduct similar to that complained of here. This pattern and practice has been manifested in other prior incidents involving officers, and employees of the Prince George's County Police Department.

Longtin thus sought to hold the Police Department directly responsible for those actions.

At trial, Longtin attempted to establish this "pattern and practice" by introducing a variety of evidence. Longtin's counsel elicited testimony from the officers regarding their questionable investigation techniques, including the makeup of the interrogation room, the guidelines for allowing suspects to sleep and eat, and violations of the rule under which an arrestee must be taken to a Commissioner within 24 hours. Longtin's counsel elicited testimony from the officers about "other marathon interrogation sessions" they had participated in, including the controversial interrogation of a developmentally disabled minor in 1998 who was incarcerated for ten months before charges were dropped. Longtin also introduced a Community Police Institute manual, a CID Policy Manual, and other training materials and policy documents, which contained constitutionally suspect directives. Longtin argued that the policies were motivated by a desire to lower the Department's "closing rate":

> In 1994, these Officers only solved 49 percent of homicides. In 1999 when this and similar cases occurred where they were keeping people up all night, they were up to 70 percent. There was articles in the paper and significant pressure from the Chief for these Officers to increase their closure rate, and it led to the problem we have here today.

At the close of trial, the jury entered a verdict in favor of Longtin on the "pattern or practice" claim.

On appeal, the Defendants argued that allowing this claim to go to the jury was legal error. The Defendants argued that Article 24 of the Maryland Constitution does not, and should not, support a "pattern or practice" type-claim. The Defendants argue that a pattern or practice claim, or *"Monell"* claim, is a creature of federal law, and is unnecessary in the Maryland context, or inconsistent with Supreme Court precedent. The Court of Special Appeals rejected this claim, stating that, "given the almost uniquely expansive reach of Maryland's constitutional tort remedy, where no official or

local governmental immunity is possible ... we think it highly unlikely that Article 24 contains any exemption from liability for an unconstitutional pattern or practice." *Longtin,* 190 Md.App. at 130–31, 988 A.2d at 40.

*Monell* is the origin of a "pattern or practice" claim in federal law. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *Monell* concerned a claim under the federal Civil Rights Act, 42 U.S.C. § 1983, by a class of female federal employees claiming that federal agencies required pregnant women to take unpaid leaves of absence during their pregnancy. The claim had been dismissed by the Second Circuit under the Supreme Court's holding of *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), which held that municipal corporations were not "people" under 42 U.S.C.A. § 1983 and could not be sued, either directly or under a theory of *respondeat superior.* The *Monell* Court was called to re-examine *Monroe,* and the extent to which a municipality could be liable for constitutional violations.

After a detailed analysis of legislative history, the Court overruled *Monroe's* holding that a municipality did not qualify as a "person" under Section 1983:

> Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers [or for] constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

*Id.* at 690–91, 98 S.Ct. at 2035–36. The Court, however, confirmed that municipalities were still free from *respondeat superior* liability under § 1983, concluding: "a municipality cannot be held liable solely because it employs a tortfeasor[.]" *Id.* at 691, 98 S.Ct. at 2036 (emphasis in original). The *Monell* decision thus set a standard under which a municipality is

liable under § 1983 for its employee's actions only if it " 'causes' [that] employee to violate another's constitutional rights." *Id.* In doing so, the Supreme Court shielded municipalities from liability in most cases of constitutional violations by public officials, and subjected them to liability only in that small subset of cases where the violation was "caused" by the municipality.

In contrast, Maryland's constitution requires more of its municipalities, and accordingly this Court has declined to shield municipalities from the unconstitutional acts of its officials. *See DiPino v. Davis,* 354 Md. 18, 729 A.2d 354 (1999). In *DiPino,* we considered a claim brought both under § 1983 and the Maryland Declaration of Rights, a common occurrence. We acknowledged that almost all of the rights protected by the Maryland Declaration of Rights are essentially identical to those protected by the U.S. Constitution. *Id.* at 43–44, 729 A.2d at 367–68. Although these rights are "parallel," we apply our constitutional principles in a entirely different manner:

> One set of rules, themselves not easy to fathom, applies to the § 1983 claims . . . Those rules have been established by the United States Supreme Court as a matter of Federal law. A second set of rules applies to the State Constitutional claims. Notwithstanding that the Federal and State rights are essentially parallel, the rules relating to redress for violation of those rights are very different. We have consistently declined to adopt the Federal approach. *Ritchie v. Donnelly,* 324 Md. 344, 597 A.2d 432 (1991); *Ashton v. Brown, supra,* 339 Md. 70, 660 A.2d 447.

*Id.* at 45, 729 A.2d at 368. *DiPino* thus made clear that the specific rules for remedying state constitutional violations will differ from the § 1983 claims.

*DiPino* then considered an issue similar to that in *Monell*; whether a municipality should be held liable through respondeat superior for the acts of its employees, and concluded:

> Although we have consistently applied *respondeat superior* liability to local governmental entities for Constitutional

violations committed by their officials, we have never actually articulated the doctrine in that context. The Court of Special Appeals has looked to a footnote in *Clea v. City of Baltimore, supra,* 312 Md. 662, 667–68 n. 3, 541 A.2d [1303,] 1305 n. 3 [ (1988) ] [29] as indicating our acceptance of the doctrine. *See Port Deposit v. Petetit,* 113 Md.App. 401, 422–23, 688 A.2d 54, 65, cert. denied, 346 Md. 27, 694 A.2d 950 (1996 [1997] ); *Branch v. McGeeney,* 123 Md.App. 330, 718 A.2d 631 (1998). We shall now dispel any doubt in the matter and make clear, as a matter of common law, that local governmental entities do, indeed, have *respondeat superior* liability for civil damages resulting from State Constitutional violations committed by their agents and employees within the scope of the employment.

*DiPino,* 354 Md. at 51–52, 729 A.2d at 372. As the Court of Special Appeals observed, our decision to impose *respondeat* liability on local governments has a firm policy foundation:

The State is appropriately held answerable for the acts of its officers and employees because it can avoid such misconduct by adequate training and supervision and avoid its repetition by discharging or disciplining negligent or incompetent employees. Moreover, there is no reason why the deterrent value of holding the State answerable for an actionable assault by one of its employees is warranted but the deterrent value of holding it liable for an employee's constitutional tort is not.

*Id.* at 53, 729 A.2d at 372, (*quoting Brown v. State,* 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129, 1142–43 (1996)).

 The Defendants' arguments on this issue caution that allowing a "pattern or practice" claim imposes burdens on

---

**29.** The footnote in *Clea* read as follows:

The governmental-proprietary distinction has not been applied, however, when local governments have been sued for violations of constitutional rights. In that situation, there is ordinarily no local governmental immunity. *See, e.g., Hebron Sav. Bk. v. City of Salisbury,* 259 Md. 294, 269 A.2d 597 (1970); *Jarvis v. Baltimore City,* 248 Md. 528, 534–535, 237 A.2d 446 (1968); *Burns v. Midland,* 247 Md. 548, 234 A.2d 162 (1967).

local governments beyond those imposed by 42 USCA § 1983. Specifically, they argue that this direct suit would "greatly expand the § 1983 liability of counties and municipalities beyond that contemplated by Congress[.]" The Defendants ignore that Maryland has already "greatly expand[ed] the [ ] liability of counties and municipalities beyond" the scope of § 1983 by imposing *respondeat superior* liability on municipalities. In *DiPino*, we held that, unlike federal law, Maryland's constitution imposed an affirmative obligation to avoid constitutional violations by its employees through "adequate training and supervision" and by "discharging or disciplining negligent or incompetent employees." Clearly, if Maryland imposes on local governments an obligation to prevent unconstitutional conduct by its employees, those same governments may not, with impunity, **cause** such conduct by unconstitutional polices or practices. A pattern or practice claim is merely a more egregious subset of the actions that are prohibited by Maryland constitutional law.

The Defendants also argue that a pattern or practice claim would "deprive the courts of its role to determine the legal question of the threshold issues [of qualified immunity.]" The Defendants argue that such a claim would not provide the same procedural protections for municipalities in a state constitutional claim "as they would for this same fact scenario in a § 1983 cause of action[.]" This argument is based upon a faulty assumption that Maryland constitutional tort law tracks the procedure and standards of the federal Civil Rights Act. "We have consistently declined to adopt the Federal approach [used in § 1983 claims.]" *DiPino*, 354 Md. at 45, 729 A.2d at 368. We have further stated:

[T]his Court has consistently held that Maryland common law qualified immunity in tort suits, for public *officials* performing *discretionary* acts, has no application in tort actions based upon alleged violations of state constitutional rights or tort actions based upon most so-called "intentional torts." The Maryland public official immunity doctrine is quite limited and is generally applicable only in negligence

actions or defamation actions based on allegedly negligent conduct.

*Lee v. Cline*, 384 Md. 245, 258, 863 A.2d 297, 305 (2004) (emphasis supplied). *See also Okwa v. Harper*, 360 Md. 161, 201, 757 A.2d 118, 140 (2000) ("A state public official alleged to have violated Article 24, or any article of the Maryland Declaration of Rights, is not entitled to qualified immunity.").

As we clearly stated in *DiPino*, Maryland's constitutional protections require more from public officials and municipalities than § 1983, and the rules and procedures of applying them are divergent from the federal rules. Like the Court of Special Appeals, we find our jurisprudence rife with evidence that Article 24 provides protection to individuals against unconstitutional "pattern or practices" of municipalities.

The Defendants further argue that even if a "pattern or practice" claim exists, Longtin failed to provide sufficient evidence to support the jury's finding:

> ... over [the Defendants'] objection, the trial court allowed [Longtin] to introduce evidence of an interview and interrogation by [the officers] of a completely unrelated criminal defendant [ ] to show pattern or practice liability against the County. The trial court also instructed the jury not to consider this evidence for any other reason than the pattern or practice claim ... Because the jury was instructed not to consider whether the individual [Defendants] caused the deprivation of [Longtin's] constitutional right based on evidence of an interview and interrogation of a completely unrelated criminal defendant ... to show pattern or practice liability against the County, *Monell*-type liability could not attach to the County.

The Defendants conclude that "[w]ithout proving a *prima facie* case of a constitutional deprivation caused by the individual [Defendants,] [Longtin] failed to prove that the County itself was the moving force behind the deprivation."

The Defendants' argument is unconvincing, and almost incoherent. Longtin clearly introduced evidence of unconstitu-

tional actions committed *against him.* He called as witnesses his interrogating officers and elicited testimony regarding the illegal actions they took in arresting and interrogating him. He introduced evidence about the exculpatory DNA tests, and established that the officers did little, if anything, after learning he was excluded. This evidence was sufficient to support a verdict of constitutional deprivation in his case.

As our intermediate appellate court explained, Longtin then introduced multitudinous evidence that his experience was not an isolated incident:

> [Longtin] set forth evidence through Detective Herndon that sleep deprivation was a "tool" of investigation that he had been trained to use. Admitted into evidence was an interview and interrogation training manual of the Prince George's County Community Police Institute that told officers they could read a suspect his rights "or wait until after he admits." The manual stated that the interrogator should consider handcuffing an angry suspect to the wall "and let [him] sit a while." Officers were advised to "wait out" a passive suspect because "few people can keep it up." If a suspect "is so convincing that you are starting to believe him . . . [l]eave the room [and] [d]on't go back unless you re-fortify your conviction that he is guilty." Detective Kerry Jerningan testified that it was departmental policy that police did not necessarily have to take the suspect before a district court commissioner within 24 hours if the suspect was continuously providing information, and confirmed that a police training manual described Md. Rule 4–212(f)(1) as "[a] Maryland procedural rule, not law" that could be waived.
>
> \* \* \*
>
> He introduced evidence of lengthy interrogations of other individuals (of 60 hours and 72 hours); another dubious confession and erroneous incarceration; an official police training manual urging constitutionally questionable actions with respect to the conduct of interrogations, *Miranda* warnings, and the right to counsel, which the individual

officers appeared to have followed "by the book"; expert testimony regarding violations of commonly-accepted police practices, evidence of serial violations of multiple constitutional rights by a number of officers; and a blurring of the line between presumptive innocence and pre-determined guilt.

*Longtin,* 190 Md.App. at 113–14, 132–133, 988 A.2d at 20, 29–30. The trial court properly limited the jury's consideration of this second batch of evidence to the pattern or practice claim, and not as evidence that Longtin's rights were violated. The jury was not unreasonable in concluding that this evidence demonstrated a pattern or practice of unconstitutional police conduct. Accordingly, the Defendants have failed to show any insufficiency or legal error in the evidence supporting the pattern or practice claim.

### IV. Admission of Exculpatory Evidence

The final argument raised by the Defendants is that the trial court erred in introducing evidence of (1) Longtin's exculpatory DNA results, and (2) the subsequent conviction of the perpetrator of the crime. The Court of Special Appeals rejected these claims, reasoning that they were not preserved for appeal:

> In the circuit court, appellants filed a motion in limine to prohibit introduction of the DNA evidence because it was not available when the district court commissioner independently determined that probable cause existed to arrest and hold Longtin. This motion was denied. When the evidence was later disclosed in testimony, appellants made no further objection. Under these circumstances the motion in limine will not preserve appellants' objection. *Pulte Home Corp.* [*v. Parex, Inc.*], 174 Md.App. [681,] 763 [923 A.2d 971, 1017, (2007) ].

* * *

> It would appear that the appellants' attack on the introduction of evidence of Oesby's arrest and conviction for Zinetti's murder was not preserved for the same reasons, discussed [above].

*Longtin,* 190 Md.App. at 134–35, 988 A.2d at 41–42. Alternatively, the Court of Special Appeals rejected these evidentiary claims on the merits.[30]

Here, the Defendants make no argument that these issues were preserved for appellate review. Instead, they state that the preservation argument "is simply without merit. The issues were preserved and the CSA rendered an opinion." The Defendants' reliance on the Court of Special Appeal's opinion is mystifying, given that the intermediate appellate court held, in the first instance, that the issues were not preserved. The Court of Special Appeals' alternative rejection on the merits does not remedy the Defendants' preservation problem. Given the Court's sound reasoning on the issue,

---

**30.** With regard to the DNA evidence, the Court of Special Appeals stated:

> Even if the issue had been preserved, Longtin contends that the DNA evidence was admissible to show that probable cause was destroyed....
>
> In our view, this is one of a number of bases that would have justified the admission of the DNA results. The DNA evidence was exculpatory. The failure of Detective Herndon to disclose this evidence in January of 2000 and his delay in providing the Maryland Police Crime Laboratory with Oesby's DNA was clearly relevant to Longtin's constitutional claim. *State v. Williams,* 392 Md. 194, 198, 896 A.2d 973 (2006) (stating that due process requires the State to disclose exculpatory evidence). Finally, we do not believe that the appellants' contention that the district court commissioner's determination of probable cause remains unassailable when Longtin has alleged and proven that the charging document was misleading and the testimony before the commissioner was false. *See supra* pp. 111–13, 988 A.2d at pp. 28–29. *See Davis v. DiPino,* 121 Md.App. 28, 78, 708 A.2d 357 (1998) (A police officer is not automatically protected from liability for an unconstitutional arrest merely because a judicial officer ultimately determines to issue a warrant.), *aff'd. in part, vacated in part,* 354 Md. 18, 729 A.2d 354 (1999); *Jones v. City of Chicago,* 856 F.2d 985, 994 (7th Cir.1988) ("If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him. They cannot hide behind the officials who they have defrauded.").

*Longtin,* 190 Md.App. at 134–35, 988 A.2d at 42. With regard to the evidence of Oesby's subsequent arrest and conviction, the court stated "such evidence was relevant to Longtin's claim that he could not have been the murderer and that Oesby was the most likely suspect." *Id.*

and the Defendants' failure to present any argument in opposition, we hold that the evidentiary issues are not preserved.

## CONCLUSION

Neither the notice provisions nor the damages cap of the Local Government Tort Claims Act apply to eliminate or limit, respectively, the jury award in this case. The 180–day notice period did not begin to run until Longtin was released from prison, and therefore his notice, filed 140 days thereafter, was timely. Moreover, retroactive application of the damages cap, enacted in 2001, to Longtin's cause of action, which was fully accrued by the end of 2000, would violate the Maryland Declaration of Rights. Finally, the Maryland Constitution recognizes a "pattern or practice" claim as part of its protections of citizens against unconstitutional actions of local government and its employees.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AND THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**

HARRELL and BARBERA, JJ., Concur and Dissent.

HARRELL, J., concurring and dissenting, in which BARBERA, J., joins.

After being charged criminally, but incorrectly, as it turned out, for the murder of his wife, Keith Longtin ("Longtin") asserted thirteen different civil causes of action[1] against Prince George's County and certain of its police officers. The jury in the Circuit Court for Prince George's County that

---

1. Longtin advanced the following counts in his civil complaint: (1) violation of Article 21 of the Maryland Declaration of Rights, (2) violation of Article 24 of the Maryland Declaration of Rights, (3) false arrest; (4) false imprisonment, (5) malicious prosecution, (6) intentional infliction of emotional distress, (7) invasion of privacy/false light, (8) pattern or practice of improper conduct, (9) intentional misrepresentation, (10) negligent detention, (11) civil conspiracy, (12) a request for declaratory judgment, and (13) negligence.

considered the evidence returned a verdict of more than $5 million. On appeal, we are asked, among the questions presented, to decide when the causes of action accrued, triggering the 180-day notice requirement of the Local Government Tort Claims Act ("LGTCA"). We are asked also to determine whether the damages cap in the LGTCA applies to the verdict, so as to reduce the jury award accordingly.

The Majority opinion, concluding neatly that each claim accrued on the date of Longtin's release from detention, employs a one-size-fits-all analysis of the LGTCA notice question. It also declines to address an unavoidable constitutional challenge associated with application of the damages cap to the verdict, which included a State constitutional tort violation. Although I agree with the conclusion of the Majority opinion that Longtin's claims should not be frustrated by the circumstances surrounding Longtin's giving of notice regarding his claims, it is not because—as the Majority opinion explains—all of his distinct, and some fundamentally different, causes of action accrued on the same date, 13 June 2000 (the date of his release from the County detention center), after which he gave notice within 180 days. Moreover, although I agree with the isolated principle articulated in the Majority opinion that the Maryland Constitution prevents the Legislature from impairing retrospectively a *vested right*, I disagree that the unliquidated, unspecified, and unknown damages claims associated with Longtin's claims at the time of their accrual (whenever that occurred) represented a substantive protected or vested right under the circumstances of this case.

Thus, I: concur with the result only reached in Part 1 of the Majority opinion; dissent as to Part 2; and, concur with the reasoning and results of Parts 3 and 4.

## I. The Notice Requirement.[2]

The Majority opinion concludes that Longtin satisfied literally the notice requirement of the LGTCA. In attaining that

---

**2.** Before proceeding, I pause to note that neither the Court of Special Appeals nor the Majority opinion in this Court address Longtin's

result, it determines that, while Longtin asserted many different causes of action, the trigger of the commencement of the notice period as to all of them began running at the same time—his release from detention. In essence, the Majority opinion crafts a one-size-fits-all analysis and holding for not just the false arrest and false imprisonment causes of action discussed in the bulk of the opinion, but also the largely neglected other causes of action. A closer and more comprehensive examination suggests to me a different analysis supplies the better course of reasoning, albeit the same outcome.

A. *Applicable Law.*

The relevant provision of the LGTCA is codified at § 5–304 of the Courts and Judicial Proceedings Article, titled "[a]ctions for unliquidated damages." Maryland Code (1974, 2006 Repl. Vol.), Courts and Judicial Proceedings Article, § 5–304. In pertinent part, it provides that "an action for unliquidated damages may not be brought against a local government or its employees unless the notice of the claim required by this section is given within 180 days *after the injury.*" § 5–304(b)(1) (emphasis added). In *Heron v. Strader,* 361 Md. 258, 263–64, 761 A.2d 56, 59 (2000), we interpreted the phrase "after the injury" in § 5–304(b)(1) as synonymous with "after the cause of action accrued." Therefore, post-*Heron,* a court determines whether notice was timely by first identifying the accrual date or event.

The Majority opinion approaches this analysis in Longtin's case largely by analogizing the LGTCA notice requirement to

argument that the County's notice contentions are "effectively not reviewable." Longtin observes that the County protested in the Circuit Court his failure to provide timely notice only in a motion for summary judgment, which the trial court denied. In *Metropolitan Mortgage Fund, Inc. v. Basiliko,* 288 Md. 25, 29, 415 A.2d 582 (1980), we held that the "denial ... of a summary judgment motion ... involves ... an exercise of discretion .... and ... absent clear abuse ... the manner in which this discretion is exercised will not be disturbed." Because no appellate court deigned to bestow scrutiny on this point, I shall confine my solitary views to the merits of the notice contentions decided actually.

statute of limitations jurisprudence. *See* Majority op. at 475, 19 A.3d at 874 ("[W]e are … guided by false arrest and imprisonment cases involving the accrual date for the statute of limitations …. [as] their policies of protecting defendants against stale claims are similar."); *see id.* at 476, 19 A.3d at 875 ("The general rule for false arrest and imprisonment case[s,] when a person is arrested and released prior to trial[,] is that the statute begins to run only when the imprisonment ends …." ) (internal quotation marks and citations omitted). Such an analogy is inapposite, as well as unnecessary. We have said clearly that, to determine when a cause of action accrues under the LGTCA notice provision, we "must examine the elements of the cause of action"—for, under our precedents, "a cause of action is said to have arisen when facts exist to support each element," including injury. *Heron,* 361 Md. at 264, 761 A.2d at 59 (internal quotation marks and citations omitted).[3]

---

**3.** The two legal concepts—statutes of limitations and notice requirements—are quite different and ordinarily one should not be used as persuasive evidence in our construction of the other. *Rios v. Montgomery County,* 386 Md. 104, 139, 872 A.2d 1, 21 (2005) ("The notice provision of the LGTCA is a condition precedent to the right of action; limitations statutes create defenses. The focus of the two, i.e., notice vis à vis limitations, is very different."); *see also White v. Prince George's County,* 163 Md.App. 129, 144, 877 A.2d 1129, 1137 (2005) *cert. denied,* 389 Md. 401, 885 A.2d 825 (2005) ("The notice requirement operates independent of the limitations period that applies generally to the filing of suit. Serving timely notice is essential to preserve a claimant's right to file suit at any time during the limitations period. In contrast to the tolling of limitations, nothing in the LGTCA expressly provides for tolling the notice period."); *Simon v. United States,* 244 F.2d 703, 704–05 (5th Cir.1957) (declining to extend an "exception[ ] to the operation of a statute of limitations" to the notice of claims provision in the Federal Tort Claims Act ("FTCA") because "[a] statute of limitations should be differentiated from conditions which are annexed to a right of action created by statute. A statute which in itself creates a new liability, gives an action to enforce it unknown to the common law, and fixes the time within which that action may be commenced, is not a statute of limitations…. Such a provision will control, no matter in what form the action is brought") (internal quotation marks and citation omitted); 3–14 JAYSON & LONGSTRETH, HANDLING FEDERAL TORT CLAIMS § 14.01 (2007) (observing that "the Supreme Court adopted [*Simon* in *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) ]"); *id.* ("The characterization of the FTCA's time limitation as a substantive condition of the

Thus, we should ask "when the legally operative facts permitting the filing of his [or her] claims came into existence." *Heron,* 361 Md. at 264, 761 A.2d at 59; *see also Hecht v. Resolution Trust Corp.,* 333 Md. 324, 334, 635 A.2d 394, 399 (1994) ("This Court [has] adopted what is known as the discovery rule, which now applies generally in all civil actions, and which provides that a cause of action accrues when a plaintiff in fact knows or reasonably should know of the wrong."); *Lumsden v. Design Tech Builders, Inc.,* 358 Md. 435, 444, 749 A.2d 796, 801 (2000) ("[W]e now hold the discovery rule to be applicable generally in all actions and the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong.").[4] Because each

United States' waiver of immunity, and therefore a jurisdictional prerequisite to recovery rather than a true statute of limitations, has been almost universally applied by the courts."); *Felder v. Casey,* 487 U.S. 131, 140, 108 S.Ct. 2302, 2308, 101 L.Ed.2d 123, 139 (1988) (distinguishing sharply between statutes of limitations and the notice-of-claim provisions on the grounds that the former are "universally familiar aspects of litigation considered indispensable to any scheme of justice," whereas the latter "are neither universally familiar nor in any sense indispensable prerequisites to litigation," though they may "significantly inhibit the ability to bring federal actions") (internal quotation marks and citation omitted).

4. The Majority opinion assails this conclusion on the grounds that the common law provides an exception for false arrest and imprisonment claims to the general rule that "a claim accrues when the legal elements materialize." Majority op. at 476, , 19 A.3d at 875 n. 18. The Majority opinion looks to *Wallace v. Kato,* 549 U.S. 384, 388–89, 127 S.Ct. 1091, 1095, 166 L.Ed.2d 973 (2007), for the contention that:

There is, however, a refinement to be considered, arising from the common law's distinctive treatment of the torts of false arrest and false imprisonment.... The running of the statute of limitations on false imprisonment is subject to a distinctive rule—dictated, perhaps, by the reality that the victim may not be able to sue while he is still imprisoned: "Limitations begin to run against an action for false imprisonment when the alleged false imprisonment ends." 2 H. Wood, Limitation of Actions § 187d(4), p 878 (rev. 4th ed.1916); *see also* 4 Restatement (Second) of Torts § 899, Comment c (1977); A. Underhill, Principles of Law of Torts 202 (1881). Thus, to determine the beginning of the limitations period in this case, we must determine when petitioner's false imprisonment came to an end.

My reading of this language leads me to conclude that the Supreme Court did not hold that the common law provides an exception, for the

cause of action possesses distinct elements (usually), we should examine each cause of action separately. Not surprisingly, under such an approach, each claim may have a unique accrual date. *Heron*, 361 Md. at 262, 761 A.2d at 58 ("[T]o assess the timeliness of [the] Notice of Claim under the LGTCA, it is necessary, first, to determine the time of [the] alleged injury for *each* of the appealed claims.") (emphasis added).

B. *False Arrest and Imprisonment.*

The Majority opinion devotes the bulk of its notice analysis (understandably perhaps) to the torts of false arrest and false imprisonment. These torts seem to be the lynchpins guiding the Court's treatment of the accrual dates for Longtin's other claims. Majority op. at 480, 19 A.3d at 877 ("Our resolution of the notice issue for false arrest and imprisonment resolves the notice issue for most of Longtin's claims."). I will focus likewise on these torts because applying the proper analysis to them alone reproves the reasoning of the Majority opinion. I submit nonetheless that a majority opinion of this Court should conduct a more comprehensive examination for each cause of action, rather than employ shortcuts.[5]

---

torts of false arrest and imprisonment, to the general rule that "a claim accrues when the legal elements materialize." Rather, it held that the common law provides an exception to the general rule that "*[l ]imitations* begin to run against an action" when the legal elements materialize. After making this point, the Supreme Court cited three sources— § 187d(4) of Limitations of Actions, comment c of the Restatement (Second) of Torts, and page 202 of Principles of Law of Torts—all of which concern statutes of limitation, not notice provisions.

The Majority opinion concedes that "[n]ot every contour of limitations jurisprudence is applicable to the LGTCA[ ] notice requirement[ ]," Majority op. at 475, 19 A.3d at 874 n. 17, and that the policies behind statutes of limitation and notice provisions "are not perfectly convergent," merely similar. Majority op. at 475, 19 A.3d at 874. I agree, as mentioned in footnote 3, *supra*. These two legal concepts and the long line of relevant, interpretive Maryland caselaw relating thereto should be respected, rather than collapsed into one. By holding that some, but not all "contour[s] of limitations jurisprudence" apply to the LGTCA notice provision, the Majority opinion invites a host of future litigation from parties trying to understand, reasonably so, just where that line is drawn. Shortcuts have consequences.

5. For purposes of ratification only, I extend the analysis (explained *infra* ) to one other cause of action pleaded by Longtin, invasion of

Unusually, the "elements of false arrest and false imprison-ment are identical"; thus, they may be considered together. *Heron*, 361 Md. at 264, 761 A.2d at 59. The elements are: "[ (1) ] the deprivation of the liberty of another[,] [ (2) ] without consent[,] and [ (3) ] *without legal justification." Heron*, 361 Md. at 264, 761 A.2d at 59 (emphasis added). "Whatever technical distinction there may be between an 'arrest' and a detention[,]' the test whether *legal justification* existed in a particular case has been judged by the principles applicable to the law of arrest." *Great Atl. & Pac. Tea Co. v. Paul*, 256 Md. 643, 655, 261 A.2d 731, 738 (1970) (emphasis added) (reviewing the distinction between the torts of false arrest and imprison-ment).

A police officer possesses *legal justification* "to make a warrantless arrest where he has probable cause to believe that a felony has been committed, and that the arrestee perpetrat-ed the offense." *Ashton v. Brown*, 339 Md. 70, 120, 660 A.2d 447, 472 (1995) (citations omitted); *see also Montgomery Ward v. Wilson*, 339 Md. 701, 721, 664 A.2d 916, 926 (1995)

---

privacy. To prove false light invasion of privacy, a plaintiff must show that the defendant "intentionally intrude[d], physically or otherwise, upon the . . . seclusion of another or his private affairs or concerns . . . [in a way that] would be highly offensive to a reasonable person." *Bailer v. Erie Ins. Exch.*, 344 Md. 515, 526, 687 A.2d 1375, 1380–81 (1997) (internal quotation marks and citation omitted). In the case *sub judice*, Longtin alleged that the police placed him in a false light by making false representations, via "public statements, public documents and public press releases . . . ."

The crux of Longtin's claim in this regard, as the Majority opinion acknowledges, was the statement of probable cause. *See* Majority op. at 482, 19 A.3d at 878 ("Longtin's false light claim arises from the assertions contained in the Statement of Probable Cause."). As such, the claim's accrual date should be the date of publication of the statement—7 October 1999. Even if we held that (1) the continuing harm rule applies in the context of notice requirements, as opposed to statutes of limitation—its legal field of origin—and (2) the press releas-es, issued after the statement of probable cause, constituted "continuing harm," the accrual date should be the latter's publication, not the date of Longtin's release from custody. *See MacBride v. Pishvaian*, 402 Md. 572, 584, 937 A.2d 233, 240 (2007) ("Under th[e continuing harm] theory, violations that are continuing in nature are not barred by the statute of limitations merely because one or more of them occurred earlier in time.") (citation omitted).

("[A] police officer carrying out ... an arrest ... is not liable for false imprisonment in connection with that arrest if the officer had ... legal [justification] to arrest under the circumstances.") (citation omitted). "[T]he act of arrest," however, "is ordinarily a momentary event." *State v. Dett,* 391 Md. 81, 93, 891 A.2d 1113, 1121 (2006). As a result:

"[T]he legal justification for the arrest ... *can dissipate over time.* The detaining authority may come into possession of information, not known at the time of arrest or not known at some earlier point in the detention, which ... may cause the legal justification ... to disappear. The standards used to determine legal justification remain the same, but, in the course of a continuing detention, their application needs to be reexamined whenever changes in the factual underpinning of their application become known."

*See id.* (emphasis added).[6]

In Longtin's case, at the moment police arguably arrested him, *viz.,* placed him into an interrogation room at 1:30 p.m. on 5 October 1999,[7] they had probable cause, *i.e.,* legal justifica-

---

6. Although *Dett* involved a case of mistaken identity—a motorist was stopped and arrested under an open warrant pertaining to another individual—its conclusions regarding the possibility of legal justification waning in false arrest/imprisonment tort actions are applicable broadly. *See State v. Dett,* 391 Md. 81, 891 A.2d 1113 (2006).

7. One may claim, as the police did, that Longtin was not "arrested" until after the interrogation. Longtin came to the police station and gave a statement voluntarily, or so the argument went. Indeed, during the early stages of the criminal prosecution against Longtin, a trial judge—considering the facts and arguments offered—found that Longtin acted voluntarily before and during the interrogation; therefore, the police did not need to "Mirandize" him and his statement was admissible. This does not impact the substance of my analysis—although the police possessed probable cause at one time, it dissipated over time.

On the other hand, one may argue that Longtin was "arrested" at 12:40 p.m., when a police cruiser commenced driving Longtin to the police department. Longtin argues that, during the entire incident, he was acting against his will. At the civil trial, however, conflicting evidence was adduced as to whether Longtin accompanied the police officer involuntarily or voluntarily. Testimony suggested that at some point during the interrogation, police took Longtin's belt, wallet, shoelaces, and cell phone—indicators of custody. Thus, 1:30 p.m. seems to

tion, to do so. On the day of the murder, 4 October 1999, the police discovered the victim with her pants and underwear at her feet and with multiple stab wounds. On the day of the "marathon" interrogation, 5 October 1999, the police learned, *before* Longtin was placed in the interrogation room, that: (1) Longtin called the police to report his estranged wife missing, (2) he knew where to locate the victim, (3) he asked, at the crime scene, if the victim was his wife, and (4) he allegedly carried a "buck knife," "used [it] very well," and had been "very abusive" to his past two ex-wives. Detective Herndon, Primary Investigator, Notes from Telephone Conversation with Charles County Sheriff's Office, 12:45 p.m.; *see also Mobley v. State*, 270 Md. 76, 81, 310 A.2d 803, 807 (1973) ("[W]hether probable cause is shown to exist may be measured in terms of the collective information demonstrated by the record to be within the possession of the entire police team.") (citations omitted).[8]

Over time, however, the probable cause/legal justification dissipated, which at some point in the continuum Longtin's cause of action accrued. Specifically, in February 2000, Longtin was excluded as a possible donor of DNA taken from the victim, to wit, a vaginal swab. Taken together with the fact that the police knew the victim was raped[9] and then mur-

---

be a better settling point as to the time of arrest or perhaps 2:30 p.m., when records reflect someone (perhaps Longtin) last used Longtin's cell phone.

If Longtin was "arrested" at the crime scene, we may say simply that his false arrest/imprisonment causes of action accrued then, as police did not have probable cause at that moment—according to Detective Herndon's notes, the telephone call with the Charles County Sheriff's Office did not occur until 12:45 p.m., 5 minutes after Longtin was detained initially.

8. During the interrogation, but extrinsic to the questioning of Longtin, Detective Herndon learned that, on the day before the murder, Longtin engaged the victim in a heated, public argument. He learned also that allegedly Longtin once choked a female at the local gym.

9. During the civil proceedings, it was taken as a foregone conclusion that the police knew the victim had been raped. She was discovered with her pants and underwear at her feet. After the murder, the detectives became aware that another neighbor had reported an at-

dered, the police no longer had probable cause/legal justification to detain Longtin.[10] Thus, the false arrest/imprisonment causes of action accrued actually in February 2000 [11]—when facts existed to support each element of the torts.[12]

tempted rape in the same vicinity and provided a description that did not match Longtin's appearance. The application for the statement of charges against the actual killer, Antonio Oesby, stated that the victim "appeared to have been ... sexually assaulted," and the statement of charges included first degree rape. Moreover, to retrieve the DNA from the victim, the police employed presumably a rape kit.

**10.** The police took a specimen of Longtin's DNA on 5 October 1999, the day of the interrogation. The police lab tested the DNA against the vaginal swab in February 2000. This was not an unreasonable period of time. Unreasonable delay, however, might provide additional good cause for a waiver of strict adherence to the LGTCA notice requirement.

**11.** The Majority opinion suggests that this analysis "would create perverse policy incentives for the State," for, under the " 'date of dissipation' rule ... the State is rewarded for keeping a prisoner *after it has lost its legal justification for doing so."* Majority op. at 477, 19 A.3d at 875 n. 19. "If the State continues the false imprisonment past that point, the clock continues to run on the prisoner's notice period, and it is less likely that the prisoner will file timely notice." *Id.*

Instead of focusing on that which is most likely, the Majority opinion becomes preoccupied by that which is least likely. The "date of dissipation" approach provides the State with a strong and undeniable incentive to release a prisoner the moment probable cause has dissipated—by doing so, the State prevents a critical element in the torts of false arrest and imprisonment from materializing, namely, detention "without legal justification." As a result, the State eliminates the possibility of an action being filed against it for false arrest or imprisonment—an adequate incentive, I think. Moreover, the longer the State holds a prisoner beyond the "date of dissipation," the more good cause exists for waiver of strict compliance with the notice requirement.

**12.** The Majority opinion perceives that this analysis "causes more problems than it solves." Majority op. at 476, 19 A.3d at 876 n. 20. It avers that identifying the " 'date of dissipation' ... is a fact-intensive issue, requiring weighing of evidence that is inappropriate for an appellate court." *Id.* Moreover, the Majority predicts that ascertaining any such date "will be heavily disputed by the State...." *Id.* The Majority opinion describes my conclusion of February 2000 for the "date of dissipation" in the present case as "[t]roublingly" because I "resolved ... disputed factual issues in a way unfavorable to Longtin, who was victorious at trial." *Id.* (quoting *Hoffman v. Stamper,* 385 Md. 1, 10, 867 A.2d 276, 282 (2005), for the proposition that "[w]e must view that evidence in a light most favorable to the part(ies) who

## C. *Heron.*

In arriving at its determination that all of Longtin's causes of action accrued on his date of release from detention, the Majority opinion discusses and distinguishes *Heron.* In *Heron*, the plaintiff was "arrested and charged with resisting arrest, obstructing the police in the performance of their duties, and disorderly conduct." *Heron*, 361 Md. at 261, 761 A.2d at 57. He was acquitted eventually of all charges and, subsequently, filed a civil suit for malicious prosecution, false arrest, and false imprisonment. *See id.* We held that Heron's false arrest and false imprisonment claims accrued upon his arrest. *See Heron*, 361 Md. at 265, 761 A.2d at 59. The Majority opinion suggests that the conclusion reached in *Heron* was achieved haphazardly.

In particular, the Majority claims that "[t]here was no need [in *Heron* ] to distinguish between the date of arrest and the date of release; whichever was used, the notice was too late." Majority op. at 473, 19 A.3d at 873. In fact, it observes that, in *Heron*, we cited "with approval multiple decisions which

prevailed on the issues to which it relates"). "The [concurrence] has disregarded our standard of review and attempted to resolve contested factual issues in a manner contrary to the jury's verdict." *Id.*

The Majority's argument highlights the frequent division between advocates and critics of bright line legal tests. While bright lines have their virtues, such as ease of application, they should not be deployed merely for convenience; they must be consistent with the law. Here, the Majority creates a bright line from whole cloth, while endeavoring unpersuasively to distinguish contrary controlling caselaw.

I am unpersuaded by the Majority's critique of the procedural burden of my analytical approach. Our state trial courts demonstrate, on a daily basis, the capacity to tackle a myriad of "fact-intensive issue[s]"— even those that are "heavily disputed by the State...." Indeed, the Maryland Civil Pattern Jury Instructions include, for use in false arrest and imprisonment cases, an instruction for probable cause. Although I engaged in a probable cause analysis *supra*, as the DNA tests and associated dates were uncontested, such an inquiry is best left, in most instances, to the trial courts. Regarding the standard of review—and notwithstanding the fact that this concurrence agrees Longtin should have been able to pursue his claims—I observe only that our charge to "view th[e] evidence in a light most favorable to the [prevailing] part[y]" does not compel appellate courts to reach otherwise incorrect conclusions of law.

identified **the date of release** as the date a false arrest or false imprisonment claim accrues." Majority op. at 473–74, 19 A.3d at 873 (citing *Collins v. County of Los Angeles,* 241 Cal.App.2d 451, 50 Cal.Rptr. 586, 588 (1966); *Ragland v. New York City Hous. Auth.,* 201 A.D.2d 7, 613 N.Y.S.2d 937, 939 (App.Div.1994); *Boose v. Rochester,* 71 A.D.2d 59, 421 N.Y.S.2d 740 (1979); *Allee v. New York,* 42 A.D.2d 899, 347 N.Y.S.2d 708 (App.Div.1973)). In each of the foreign cases relied on by the Majority opinion, "[t]here was [similarly] no need to distinguish between the date of arrest and the date of release; whichever was used, the notice was too late." Majority op. at 473, 19 A.3d at 873. Indeed, all of the cases involved plaintiffs who, like Heron, were detained for a very brief period of time, *i.e.,* one day. Given the Majority's reason for deeming *Heron* unenlightening, one wonders why these foreign cases were more persuasive to the Majority than *Heron* seemed to be.

Three of those foreign cases (*i.e.,* all but *Collins* ) appear in unanalyzed string citations in *Heron.* I find more relevant and persuasive the cases the *Heron* Court cites and fleshes out. They include *Collins; Allen v. District of Columbia,* 533 A.2d 1259, 1263 (D.C.App.1987); *Livingston v. Consolidated City of Indianapolis,* 398 N.E.2d 1302 (Ind.App.1979); *Pisano v. City of Union City,* 198 N.J.Super. 588, 487 A.2d 1296, 1299 (N.J.Super.Law Div.1984); *Michaels v. New Jersey,* 955 F.Supp. 315 (D.N.J.1996); and *Deary v. Three Un–Named Police Officers,* 746 F.2d 185 (3rd Cir.1984).

In *Collins,* the California Court of Appeal held that "it is only reasonable to assume that *immediately* upon their arrest and imprisonment [the plaintiffs] would have believed the same to be unlawful, at which time they could and should have sought legal assistance to determine the cause and the reason for their arrest. . . ." *Collins,* 50 Cal.Rptr. at 589 (emphasis added) (observing that false arrest/imprisonment and malicious prosecution do not share the same accrual date because they do not share the same elements). In *Allen,* the District of Columbia Court of Appeals stated that "[a ]*ccording to the facts of this case,* any injury for the alleged false arrest . . . would have been sustained at the time of [plaintiff's] arrest

and transport to police headquarters...." *Allen*, 533 A.2d at 1263 n. 9 (emphasis added) (citation omitted) (interpreting statute which required notice within six months "after the injury or damage was sustained"). In *Livingston*, the Indiana Court of Appeals concluded that "[the plaintiff's] claims for false arrest, false imprisonment, and assault and battery accrued on ... [a single] day"—when "[she] was arrested, charged, and released from custody." *Livingston*, 398 N.E.2d at 1303 (citation omitted).

In *Pisano*, the Superior Court of New Jersey held that a "plaintiff's cause of action for false arrest accrued as of the date of arrest...." *Pisano*, 487 A.2d at 1299 (citing *Collins* for the proposition that "[t]he interpretation of the California statute, upon which the New Jersey Tort Claims Act is modeled, provides authority for the view that a cause of action accrues at the time of the arrest"); *see id.* (observing that false arrest and malicious prosecution do not share the same accrual date because they do not share the same elements). In *Michaels*, the federal District Court found that a plaintiff's causes of action "accrued ... when [she] had reason to know that the elements of the claims existed," which "occurred at or about the time of [her] arrest...." *Michaels*, 955 F.Supp. at 326 (citations omitted). Finally, in *Deary*, the United States Court of Appeals for the Third Circuit—interpreting the Virgin Islands Tort Claims Act, V.I. CODE ANN. tit. 33, § 3401 (2000)—provided that false arrest/imprisonment accrued when the plaintiff "knew or had reason to know of the injury that constitutes the basis of this action," which it held was the date of arrest. *Deary*, 746 F.2d at 193 (stating that when the plaintiff was arrested, her cause of action accrued because "nothing further had to occur"; "so far as she knew[,] she was arrested without probable cause").

Returning to *Heron*, we said that "to determine when ... causes of actions arise, we must examine the elements of the cause of action ... as a cause of action is said to have arisen when facts exist to support each element." *Heron*, 361 Md. at 264, 761 A.2d at 59 (internal quotation marks and citation omitted). *Heron* demonstrated that other jurisdictions exam-

ine also the elements of each claim to determine when it accrued—they did not opine that all tort claims in a complaint accrue on the same date, nor that false arrest and imprisonment claims *always*, regardless of the particular circumstances of each case, accrue on the same date. Such a one-size-fits-all, "domino" approach, in which one accrual date dictates the rest, is inconsistent with well-established tort law. At the very least, these cases militate against the Majority opinion's suggestion that *Heron's* reliance on foreign cases actually supports its position that the accrual date for all false arrest/imprisonment claims is the plaintiff's date of release.

In sum, we did not in *Heron* select haphazardly the date of arrest as the accrual moment. Rather, the Court examined the record and held that "[t]he facts alleged to support each element of his claim were in existence" when "he was arrested and detained by the police." *Heron*, 361 Md. at 265, 761 A.2d at 59. As a result, Heron's "causes of action ... arose" on the date of arrest. *Id.* Assuming the Majority opinion employs the wrong analysis in evaluating the notice question and that a proper analysis yields a conclusion that the day of Longtin's arrest was the correct accrual date of these causes of action, must Longtin's claims fail for improper notice? The answer is "No."

### D. *Substantial Compliance or Waiver for Good Cause under the LGTCA?*

Because, in my view, Longtin's false arrest/imprisonment causes of action accrued in February 2000, his October 2000 notice to the County was untimely. If, however, Longtin complied substantially with the LGTCA notice requirement or demonstrated good cause, he should be permitted nonetheless to pursue his civil claims. Substantial compliance is possible ordinarily when a plaintiff files timely notice, but fails to abide some other procedural requirement, *e.g.*, service on a proper recipient. *See Faulk v. Ewing*, 371 Md. 284, 299, 808 A.2d 1262, 1272–73 (2002) ("[S]ubstantial compliance is such communication that provides ... requisite and timely notice of facts and circumstances giving rise to the claim.") (internal

quotation marks and citation omitted). In the present case, Longtin's notice was untimely and, thus, a poor fit for substantial compliance.

Waiver for good cause, in the context of the § 5–304 notice requirement, is possible where "the claimant prosecuted his [or her] claim with that degree of diligence that an ordinarily prudent person would have exercised under the same or similar circumstances." *Heron,* 361 Md. at 271, 761 A.2d at 63. Based on a survey of other jurisdictions, we recognized in *Heron* that circumstances justifying good cause "fit [normally] into several broad categories: excusable neglect or mistake, *see e.g.,* ... *Kleinke v. Ocean City,* 147 N.J.Super. 575, 371 A.2d 785 (N.J.Super.App.Div.1977); serious physical or mental injury and/or location out-of-state; the inability to retain counsel in cases involving complex litigation; and ignorance of the statutory notice requirement...." *Heron,* 361 Md. at 272–73, 761 A.2d at 63–64 (citations omitted). A plaintiff is not excused, however, because he or she is occupied preparing for a criminal trial. *See id.*

In *Kleinke,* the Superior Court of New Jersey found excusable neglect where the plaintiff, among other things, was "confine[d] to a hospital for two months" and was "incapacitat[ed by a complication] of an embolism...." *Kleinke,* 147 N.J.Super. at 580, 371 A.2d at 788. Unlike the plaintiff in *Kleinke,* Heron was imprisoned for two days, but then released and delayed filing his notice. He argued that the Court should grant a waiver for good cause because, post-release, he was immersed in the planning of his defense to the criminal charges. We held that Heron, who was no longer imprisoned, was not so burdened by his preparation for the impending criminal trial as to prevent the filing of a simple written notice. *Heron,* 361 Md. at 271, 761 A.2d at 63 ("We agree ... that an ordinarily prudent person, *in [Heron's ] circumstances,* would have been able, through the exercise of reasonable diligence, to file ... a Notice of Claim.") (emphasis added).

In the present case and unlike *Heron,* Longtin was impris-
oned for a substantial period of time, while the notice period(s)
for his causes of action was (were) running. It was not a
matter simply of finding time to file the notice; it was finding
a way to file notice while "confine[d]" and "incapacitat[ed],"
like the plaintiff in *Kleinke.* At bottom, then, I would con-
clude that Longtin acted with the due diligence of a reasonable
person isolated in a detention center for eight months, such
that his neglect should qualify under the first *Heron* category
for waiver of strict compliance with the LGTCA notice re-
quirement.

## II. The Damages Cap.

### A. *Vested Rights Analysis Is Inapposite.*

The Maryland Constitution prohibits the Legislature from
impairing retrospectively vested rights. One necessarily asks,
in performing such an analysis, what constitutes a protected
vested right? From its infancy, our vested rights jurispru-
dence focused on a plaintiff's ability (or inability) to bring a
cause of action. Thus, 150 years ago in *Thistle v. The
Frostburg Coal Co.,* 10 Md. 129, 144 (1856), we confronted a
purported retrospective legislative provision which enabled
adverse possessors of real property to challenge paper title
holders on the basis of mere use, rather than the then-law,
actual enclosure. Because the statutory provision "changed
the elements of adverse possession" to make it easier for
adverse possessors to challenge successfully paper title hold-
ers, we deemed it invalid. *Dua v. Comcast Cable of Md., Inc.,*
370 Md. 604, 623, 805 A.2d 1061, 1072 (2002) (citing *Thistle*);
see also *Thistle,* 10 Md. at 145 ("Hence, . . . it was not in the
power of the legislature to change this rule of law, so far as to
give it retroactive operation, because it would virtually be
taking the land of one man, held [previously] by a good legal
title, and giving it to another, who the law has said had
none."). We made clear in *Thistle,* however, that "it *was*
within the power of the legislature, to alter and remodel the
rules of evidence and *remedies,* to which parties claiming title

and possession of land, might resort...." *Thistle,* 10 Md. at 145 (emphasis added).

Reflecting in *Dua* on our *Thistle* holding, we concluded that "there is a vested right in an accrued cause of action." *Dua,* 370 Md. at 632, 805 A.2d at 1077. As in *Thistle,* we recognized that there is a difference between the Legislature abrogating the right to bring a cause of action, and the Legislature altering the remedy sought by, but not yet conferred upon, a plaintiff. In particular, we relied on *Baugher, et al. v. Nelson,* 9 Gill 299, 308 (1850), which upheld a retrospective provision because "[i]t [was] no more than the exercise of the legislative authority over the subject of remedies[, a] power which the legislative may unquestionably exercise at pleasure in relation to past as well as future contracts." We looked also to *WSSC v. Riverdale Fire Co.,* 308 Md. 556, 564, 520 A.2d 1319, 1323 (1987), in which we observed that "a statute governing [only] procedure or remedy will be applied to [all] cases," whether they be "accrued, pending or future...." *WSSC,* 308 Md. at 563 n. 2, 564, 520 A.2d at 1323. In addition, we invoked *Allen v. Dovell,* 193 Md. 359, 363, 66 A.2d 795, 797 (1949), which acknowledged that "[i]t is thoroughly understood that a statute of limitations, which does not destroy a substantial right, but simply affects remedy, does not destroy or impair vested rights."

We expressed some reservations in *Dua* regarding the distinction between remedy and substantive right, but, in the process, strengthened further the ultimate holding that the Legislature may change, under many circumstances, the former with retrospective effect, but not the latter. In particular, we quoted from *State, use of Isaac v. Jones,* 21 Md. 432, 437 (1864) for the contention that the " '*abrogation* or suspension of a remedy, necessary to enforce the obligation of an existing contract, ... is void.' " *Dua,* 370 Md. at 635, 805 A.2d at 1079 (emphasis added). We relied on *Allen,* 193 Md. at 363–64, 66 A.2d at 797 to underscore that by "cut[ting] off *all* remedy ... in such a way as to preclude any opportunity to bring suit," the Legislature "deprive [s improperly] a party of his [accrued] cause of action...." (Emphasis added.) In

these and other cases, we recognized that the Legislature may legislate retrospectively, as long as the effect does not cut off all remedy. Contrary to this principle, the Majority concludes that the Maryland Constitution protects not only a plaintiff's accrued right to bring a cause of action, but also his or her associated prospect of recovering an amount of as-of-yet unidentified, uncertain, and unawarded damages. *See* Majority op. at 486–87, 19 A.3d at 881.

### B. *Dua.*

The Majority opinion relies heavily on *Dua* to bolster its conclusion that the Maryland Constitution protects against the legislative impairment of the recovery of any amount of damages associated with causes of action. *See id.* It seizes upon the *Dua* Court's description of the statute there as one that abrogates the plaintiffs' rights to "particular sum[s] of money. . . ." *Dua*, 370 Md. at 642, 805 A.2d at 1083. Seemingly, the Majority opinion equates "particular sum[s] of money" with the unliquidated damages claims Longtin sought at the time the Legislature amended the damages cap in the LGTCA. The Majority does so wrongly.[13]

---

**13.** It is a bit unclear what exactly the Majority opinion holds on this issue. It seems to state that the Legislature is prevented from reducing retrospectively any particular sum of money. It suggests also, however, that the Legislature is prevented only from so reducing "significantly" sums of damages. *Compare* Majority op. at 488–89, 19 A.3d at 882 (quoting favorably the Florida Supreme Court, in *Kaisner v. Kolb*, 543 So.2d 732, 739 (Fla.1989), for the proposition the Legislature may not impair even partially the amount of recovery) *with id.* at 488–90, 19 A.3d at 882–83 (quoting favorably *Allstate Ins. Co. v. Kim*, 376 Md. 276, 296, 829 A.2d 611, 622 (2003), for the proposition that "the standard for determining whether retroactive legislation violates . . . the Maryland Constitution is **whether it abrogates or significantly impairs** 'vested rights' "), *and* Majority op. at 489, 19 A.3d at 883 ("It is patent that the *enormous* loss to Longtin from application of the statutory cap would 'impair' his cause of action.") (emphasis added).

By holding (possibly) that a retrospective damages cap is unconstitutional when it caps "significantly" impairs an *ad damum* claim and/or resultant verdict, the Majority opinion sidesteps a difficult question. Assuming the ability to obtain a verdict to some amount of damages constitutes a protected "vested right" (a suggestion with which I disagree), is any retrospective cap constitutional? If so, we should then address whether the LGTCA $200,000/$500,000 limit—taken in iso-

In *Dua,* we confronted consolidated cases where two plaintiffs sought to recover "particular sum[s] of money" already paid to two creditors. When the plaintiffs made the payments, however, the creditors did not have a right to demand or receive the money. *Dua,* 370 Md. at 611–16, 805 A.2d at 1066–68. In a sense, then, the plaintiffs were pursuing replevin-type actions to recover wrongfully relinquished and unreturned liquidated amounts of money, *i.e.,* property.

Subsequent to the wrongful payments, the Legislature passed laws purporting to grant to those creditors retrospectively a right to the money. The Legislature was not limiting, however, the amount of damages the aggrieved plaintiffs could recover from the creditors, *over and above* their already-paid sums of money. Rather, it purported to eliminate the heart of the dispute—the plaintiffs' right to brings claims to recover their already-paid, known sums. It was, in other words, "taking the [property] of one man, held [previously] by a good legal title," *i.e.,* the money paid by the plaintiffs, "and giving it to another, who the law has said had none," *i.e.,* the creditors. *Thistle,* 10 Md. at 145.

In the present case, the heart of the dispute was the underlying torts of false arrest/imprisonment, malicious prosecution, etc. By limiting, through the LGTCA, the amount of possible damages Longtin could recover, the Legislature was *not* affecting his ability to bring and pursue his claims in the first instance. As we stated in a related context, punitive damages:

> [T]he limitation upon recoverable noneconomic tort damages under § 11–108 of the Courts and Judicial Proceedings Article does not amount to a restriction upon access to the courts.... The plaintiffs' cause of action based on negligence was *not* abolished by § 11–108. Instead, § 11–108

---

lation—is appropriate constitutionally. Instead, the Majority opinion implies that a retrospective damages cap becomes more or less valid, depending on the size of the trial award. Such an oscillating approach is inconsistent with our State Constitution, caselaw, and commonsense.

simply modifies the law of damages to be applied in tort cases.

*Murphy v. Edmonds,* 325 Md. 342, 366, 601 A.2d 102, 114 (1992) (emphasis added).[14]

C. *Does the LGTCA Damages Cap Vitiate Effectively a Substantive Right?*

Having concluded that the Legislature may limit retrospectively the amount of damages to some extent and under certain circumstances, I now ask (rhetorically) whether the LGTCA damages cap limits recovery effectively "in such a way as to preclude any opportunity to bring suit...." *Allen,* 193 Md. at 363–64, 66 A.2d at 797. By enacting the $200,000/ $500,000 LGTCA damages limit, I conclude that the Legislature did not so transform plaintiffs' substantive rights.

Prior to the LGTCA, local governments (but not their officers or employees) enjoyed immunity against most non-constitutional tort claims. *See Housing Auth. v. Bennett,* 359 Md. 356, 359–60, 754 A.2d 367, 368–69 (2000). Through the LGTCA, the Legislature altered the common law, giving plaintiffs limited access to the often sizable assets of local government, which must satisfy the awards returned by juries. *Ashton,* 339 Md. at 107–08, 660 A.2d at 465–66 (stating that the Legislature, through the LGTCA, provided "a remedy for those injured by local government officers ..., while ensuring that the financial burden ... is carried by the [ultimately responsible] local government"). In the process, it encour-

---

14. In Part II.A–B, *supra,* I conclude that, although the Maryland Constitution protects only a plaintiff's right to bring an accrued cause of action, his or her ability to recover unliquidated (*i.e.,* not yet determined or awarded) damages is not protected quite so sweepingly. The Majority opinion is unfazed by the fact that there was "no 'particular' sum" to which Longtin was entitled "when the statute was changed[.]" *Id.* at 488, 19 A.3d at 882. In *Cooper v. Wicomico County,* 284 Md. 576, 584, 398 A.2d 1237, 1241 (1979), however, we highlighted the important distinction between constitutionally-protected liquidated sums and unprotected unliquidated sums. We stated that the Legislature may not alter retrospectively the amount of workers' compensation an employer *already* had to pay an employee. *See Cooper,* 284 Md. at 582–83, 398 A.2d 1237. The employer's monetary obligation was not

aged coincidentally local governments to better train their officers and employees. To mitigate the budgetary impact of this statutory sea change, the Legislature also limited the amount that plaintiffs could recover. *See Murphy v. Edmonds,* 325 Md. at 370, 601 A.2d at 115–16 (holding that "the Legislature did not act arbitrarily in enacting" a $350,000 cap on noneconomic damages in personal injury actions, as it possessed "several studies which concluded that $250,000 would cover most noneconomic damage claims"); *Gooslin v. State,* 132 Md.App. 290, 296, 752 A.2d 642, 645 (2000), *cert. denied,* 359 Md. 334, 753 A.2d 1031 (2000) (finding constitutional the Maryland Tort Claims Act, Maryland Code (1984, 2009 Repl. Vol) State Government Article, §§ 12–101 *et. seq.,* because the $50,000 waiver represented the level at which the Legislature chose to waive governmental immunity). The $200,000/$500,000 damages cap was a reasonable, rational, and constitutional balancing. Indeed, it may well have been a necessary prerequisite to the passage of the LGTCA.

D. *May a Statutory Damages Cap Apply to an Award for Successful Constitutional Tort Claims?*

Because the Legislature is permitted to cap damages recovery retrospectively and because the LGTCA cap is not so unduly low as to equate with cutting off all remedy, the damages cap should apply to the jury award in the present case. The fact that Longtin brought and proved constitutional tort violations does not dictate a different result under the Maryland Constitution or the legislative history of the LGTCA.

At common law (that is, before the LGTCA), a plaintiff could bring a constitutional tort claim directly against local government officers and employees, as well as their employers—the local governments. After the passage of the LGTCA, a plaintiff lost, however, his/her/its ability to recover from the officers and employees, provided those tortfeasors acted within the scope of employment. The LGTCA restriction on liability ultimately applies to constitutional and non-

---

"speculative," but was known and vested. *Cooper,* 284 Md. at 584, 398 A.2d at 1241.

constitutional tort claims alike, such that a plaintiff bringing a constitutional claim may recover only from the employing-local government. *See DiPino v. Davis,* 354 Md. 18, 52, 729 A.2d 354, 371 (1999) ("[L]ocal governmental entities do, indeed, have *respondeat superior* liability for civil damages resulting from State Constitutional violations committed by their agents and employees within the scope of the employment."); *Ashton,* 339 Md. at 108 n. 19, 660 A.2d at 465 n. 19 ("[T]here is no exception in the [LGTCA] for constitutional torts.... [T]he local government is required to pay the judgment against the employee ....."); *see also Lee v. Cline,* 384 Md. 245, 256, 863 A.2d 297, 304 (2004) (holding that the Maryland Tort Claims Act applies to constitutional and non-constitutional torts, such that the State steps into the shoes of public officials for purposes of liability).

Moreover, we recognize, at least implicitly, that the LGTCA procedural requirements (*e.g.,* notice) apply also to constitutional tort claims. *Ashton,* 339 Md. at 108 n. 19, 660 A.2d at 465 n. 19 ("[Although] there is no exception in the [LGTCA] for constitutional torts[,] .... [t]he parties in this case[, who raised constitutional and non-constitutional claims,] would appear to have waived [its] procedural requirements."); *see also Gonzalez v. Cecil County,* 221 F.Supp.2d 611, 615–16 (D.Md. 2002) (dismissing state constitutional tort claims because plaintiffs did not comply with the LGTCA notice requirement). The Court of Special Appeals has applied the notice requirement to constitutional tort claims in at least three cases. *See Wilbon v. Hunsicker,* 172 Md.App. 181, 913 A.2d 678 (2006) *cert. denied* 398 Md. 316, 920 A.2d 1060 (2007); *White v. Prince George's County,* 163 Md.App. 129, 877 A.2d 1129 (2005), *cert. denied,* 389 Md. 401, 885 A.2d 825 (2005); *Chappelle v. McCarter,* 162 Md.App. 163, 873 A.2d 458 (2005).

We implied that the LGTCA damages cap should apply to constitutional claims. In *Ashton,* 339 Md. at 108 n. 19, 660 A.2d at 465 n. 19, we observed that "there is no exception in the [LGTCA] for constitutional torts." Therefore, "[a]s long as the local government employee is acting in the scope of his employment and without malice, the local government is required to pay the judgment against the employee to the extent it represents compensatory damages, *up to certain statutory*

*limits."* *Id.* (emphasis added); *see also Ashton,* 339 Md. at 108, 660 A.2d at 466 (holding that "plaintiffs are entitled to a trial" for their constitutional tort claims and that "[a]ny judgment rendered should, *under the* [*LGTCA* ], be paid by the City") (emphasis added).

We also held relevantly that the cap on noneconomic damages in § 11–108 of the Courts and Judicial Proceedings Article applies to constitutional claims. Specifically, in *Green v. N.B.S., Inc.,* 409 Md. 528, 544, 976 A.2d 279, 288 (2009), we agreed with the Court of Special Appeals that:

> [N]othing in the legislative history [of § 11–108] suggests that the General Assembly even thought of the difference between actions claiming personal injury due to common law torts as opposed to causes of action claiming personal injury arising out of statutory or constitutional torts. And, when interpreting a statute, a court must presume that the legislature did not intend to make any alteration other than what is specified and plainly pronounced. Also, in light of the reasons for the original cap statute, and its amendment, it is impossible to believe that the legislature intended to narrow the statute in the way appellant suggests *so that insurers would now have to cover non-economic damages awards that exceeded the cap so long as the personal injury action arose out of the violation of a statute or a constitutional provision.*

(citation omitted) (emphasis added).

Regarding the damages cap provided by the Maryland Tort Claims Act, we observed in *Benson v. State,* 389 Md. 615, 628, 887 A.2d 525, 532 (2005), that not "all constitutional tort claims must [necessarily] comply with the ... MTCA." We reasoned thus, however, because the constitutional provision at issue— Article 14 of the Maryland Declaration of Rights—was not "compensable in monetary damages." *Id.* Presumably, therefore, constitutional violations that *are* compensable in monetary damages are governed by the MTCA.[15]

---

15. Longtin argues there is another reason why the LGTCA damages cap should not apply. The LGTCA provides that an "employee shall be fully

In sum, I would hold that good cause existed to waive Longtin's failure to comply strictly with the LGTCA notice requirement. I would conclude also that the LGTCA damages cap limits Longtin's overall recovery. In all other respects, I agree with the Majority opinion.

Judge BARBERA authorizes me to state that she joins the views expressed in this concurring and dissenting opinion.

---

liable for all damages awarded in an action in which it is found that the employee acted with actual malice." "In such circumstances, the Rule continues, 'the judgement may be executed against the employee and the local government may seek indemnification for any sums it is required to pay....'" Maryland Code (1974, 2006 Repl.Vol.), Courts and Judicial Proceedings Article, § 5–302(b)(2)(i)–(ii); *see also Housing Auth. v. Bennett*, 359 Md. 356, 361, 754 A.2d 367, 370 (2000) (same).

The jury found here that all of the employees-defendants acted with actual malice. After ruling that "there was insufficient evidence of actual malice to submit the issue to the jury as to Detectives Harding, Frankenfield and Clerk," the trial judge, in his post-verdict rulings, found nonetheless that Detective Herdon acted with actual malice. The trial court, however, reduced Detective Herdon's personal judgment from $350,000 to $50,000, after considering various mitigating factors. *See Prince George's County v. Longtin*, 190 Md.App. 97, 143 n. 60, 988 A.2d 20, 47 n. 60 (2010). According to Longtin, under § 5–302(b)(i)–(ii), Detective Herdon should pay not only his $50,000 judgment, but also the $5 million judgment against Prince George's County. Neither the trial court nor the Court of Special Appeals confronted this issue. Moreover, we did not grant certiorari on this precise question. I suspect this question may need to get sorted-out as efforts to collect the award proceeds.